# Illinois Official Reports

## Appellate Court

---

### *In re Curtis W.*, 2015 IL App (1st) 143860

---

| | |
|---|---|
| Appellate Court Caption | *In re* CURTIS W., JR., a Minor, Respondent-Appellant (The People of the State of Illinois, Petitioner-Appellee, v. Curtis W., Sr., Respondent-Appellee). |
| District & No. | First District, Sixth Division<br>Docket No. 1-14-3860 |
| Filed | June 12, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 13-JA-207; the Hon. Andrea M. Buford, Judge, presiding. |
| Judgment | Reversed and remanded with directions. |
| Counsel on Appeal | Robert F. Harris, Public Guardian, of Chicago (Kass A. Plain and Janet L. Barnes, of counsel), for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg and Nancy Kisicki, Assistant State's Attorneys, of counsel), for the People.<br><br>Stephen Jaffe, of Chicago, for appellee Curtis W., Sr. |
| Panel | JUSTICE HALL delivered the judgment of the court, with opinion.<br><br>Presiding Justice Hoffman and Justice Lampkin concurred in the judgment and opinion. |

**OPINION**

¶ 1 Pursuant to Illinois Supreme Court Rule 311(a) (eff. Feb. 26, 2010) and Rule 306(a)(5) (eff. Feb. 16, 2011), the respondent-minor, Curtis W., Jr. (Curtis Jr.), brings this expedited appeal from an order of the circuit court of Cook County denying the State's petition to terminate the parental rights of the respondent-father, Curtis W., Sr. (the respondent). On appeal, Curtis Jr. contends that the trial court's determination that termination of the respondent's parental rights was not in the best interest of Curtis Jr. was against the manifest weight of the evidence. He further contends that the trial court erred when it determined that the State failed to prove by clear and convincing evidence that the respondent was unfit under section 1(D)(b) and (i) of the Adoption Act (750 ILCS 50/1(D)(b), (i) (West 2014)).

¶ 2 We do not need to address Curtis Jr.'s second contention. The respondent does not challenge the trial court's finding that he was unfit under section 1(D)(m) of the Adoption Act (750 ILCS 50/1(D)(m) (West 2014)). The finding of unfitness on one ground is sufficient. See *In re M.J.*, 314 Ill. App. 3d 649, 655 (2000) (if there is sufficient evidence to satisfy any one ground of unfitness, the reviewing court need not consider the other findings of parental unfitness).

¶ 3 BACKGROUND

¶ 4 Curtis Jr. was born on October 12, 2012 to Shanea S. and the respondent. From November 2012 to March 2013, the respondent was incarcerated at the Illinois River Correctional Center in Canton, Illinois, serving a sentence for drug possession.

¶ 5 On January 14, 2013, Chicago police officers executed a warrant at Shanea S.'s residence and found Shanea S. and Curtis Jr. on a bed within reach of illegal substances and drug paraphernalia. On February 26, 2013, Curtis Jr. was taken into custody by the Department of Children and Family Services (DCFS).

¶ 6 I. Juvenile Court Proceedings

¶ 7 On February 28, 2013, a temporary custody hearing was held on the State's petition for adjudication of wardship. Temporary custody was granted to DCFS. Following a confirmation of paternity, the respondent was appointed counsel. At a hearing on May 17, 2013, Curtis Jr. was adjudicated a neglected minor based on his injurious environment. The disposition order stated that neither parent had made substantial progress toward the return home of Curtis Jr. A permanency order was entered with the goal that Curtis Jr. would be returned home within 12 months. The order further provided that Curtis Jr. be placed in a foster home with Zaria S., Curtis Jr.'s half sister.[1] Both parents were required to engage in and make reasonable progress in the recommended services, including individual therapy, parent coaching, and substance abuse treatment.

¶ 8 By August 13, 2013, neither parent had made reasonable progress toward the permanency goal for the return home of Curtis Jr. within 12 months. The trial court ordered the permanency goal continued. Curtis Jr. remained with Zaria S. in foster care. On March 18, 2014, the

---

[1]Zaria S. was placed in DCFS custody in February 2012, based on medical neglect by Shanea S. The respondent is not the father of Zaria S.

permanency goal for Curtis Jr. was changed to substitute care pending the court's determination on the termination of parental rights.

¶ 9                                   II. Termination Proceedings[2]

¶ 10          On June 17, 2014, the State filed a supplemental petition for the appointment of a guardian with the right to consent to the adoption of Curtis Jr. See 705 ILCS 405/2-29 (West 2014). The supplemental petition alleged that Shanea S. and the respondent were unfit in that: (1) both parents failed to maintain a reasonable degree of interest, concern or responsibility for Curtis Jr.'s welfare; (2) Shanea S. deserted Curtis Jr. for more than the three-month period prior to the commencement of the termination proceedings; (3) the respondent had behaved in a depraved manner; and (4) both parents failed to make reasonable efforts to correct the conditions that were the basis for the removal of Curtis Jr. from them and/or failed to make reasonable progress toward the return of Curtis Jr. to them within nine months after the adjudication of neglect or abuse. 750 ILCS 50/1(D)(b), (c), (i), (m) (West 2014). On October 6, 2014, Shanea S. executed a consent for the adoption of Zaria S. and Curtis Jr.

¶ 11          On November 6, 2014, a hearing was held on the fitness phase of the termination proceedings. The testimony from the fitness hearing is presented for background and context purposes only. In addressing the ultimate issue in this case, our focus is on the evidence presented at the best interest hearing. See *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 3.

¶ 12                                   A. Fitness Hearing

¶ 13          Sean Cline was employed as a foster case manager at Children's Place Association and was assigned to Curtis Jr.'s case. Mr. Cline oversaw the respondent's assessment for services. The respondent was ordered to submit to random toxicology screenings. Based on his substance abuse assessment, the respondent was required to complete the outpatient substance abuse program at Haymarket. He was also required to participate in individual counseling services and parent coaching services. The respondent understood that he had to complete these services in order to be reunited with Curtis Jr.

¶ 14          The respondent began his individual counseling and parent coaching through Mary & Tom Leo Associates. The respondent was willing and engaged during the individual therapy sessions. According to the parenting coach, the respondent interacted appropriately with Curtis Jr. during the sessions and would probably benefit just by increasing his knowledge of child development and proper discipline techniques. The individual counseling and parent coaching sessions ended after three months when the respondent was arrested for violating his parole in August 2013.

¶ 15          The respondent began submitting to random toxicology tests in April 2013. On July 13, 2013, he tested positive for "cannabinoid." On April 17, 2013, the respondent was assessed for substance abuse and referred to the Haymarket program for treatment. However, he missed three intake appointments and never entered the Haymarket program.

_____

[2]The evidence as to Zaria S. and Curtis Jr. was presented at the termination proceedings in this case. Shanea S. consented to the adoption of Zaria S. by Zenophas Grey, the foster mother. The putative father of Zaria S. was served by publication, and his rights were terminated by default. Only the evidence relevant to Curtis Jr. and the respondent will be set forth.

¶ 16    Due to his incarceration, both the individual counseling and the parental coaching were terminated unsatisfactory. These service requirements and the substance abuse treatment requirement remained outstanding.

¶ 17    The respondent had weekly visitation privileges with Curtis Jr. In addition, the foster mother allowed him to visit Curtis Jr. more frequently. At one point, Mr. Cline felt that the respondent was not taking full advantage of the opportunities for extra visits with Curtis Jr. After he encouraged the respondent to visit more often, the respondent's visits increased. For the first month or two, the respondent's visits with Curtis Jr. were once a week. He increased the visits to twice a week and then to two to three times a week. The respondent's interactions with Curtis Jr. were appropriate.

¶ 18    The respondent was arrested in August 2013 for violating his parole. The respondent did not want Curtis Jr. visiting him at the Cook County jail. In early 2014, after his transfer to the Sheridan Correctional Center (Sheridan), the respondent requested visitation with Curtis Jr. In March 2014, Mr. Cline accompanied Curtis Jr. on a visit with the respondent at Sheridan. Prior to that, his last visit with Curtis Jr. was at the end of July or the beginning of August 2013.

¶ 19    Following the March 2014 visit, the respondent did not request any further visits until August 2014. A visit with Curtis Jr. was scheduled for September 2014, but was cancelled due to transportation problems. For Curtis Jr.'s birthday in October 2014, the respondent sent a birthday card with a handwritten note expressing his love and how much Curtis Jr. meant to him. Mr. Cline acknowledged that an incarcerated parent is only entitled to quarterly visits. He further acknowledged that the respondent's toxicology tests were negative in April, May and June 2013.

¶ 20    Mr. Cline met with the respondent several times at Sheridan. The respondent told him he was participating in group therapy, a 12-step program and a parenting program for incarcerated fathers. His participation in these programs was confirmed by the correctional counselor. Mr. Cline had received letters from the respondent reporting what programs he was participating in and that he wished to be part of Curtis Jr.'s life. According to Mr. Cline, from the very beginning, the respondent wanted Curtis Jr. returned to him.

¶ 21    The respondent testified as follows. He was incarcerated at the time Curtis Jr. was placed in DCFS's custody. Since he was not involved in the drug allegations against Shanea S. that brought the case into the court system, he did not understand why he was required to participate in the services. However, after Mr. Cline explained to him that in order for him to be involved in Curtis Jr.'s life he needed to participate in the services, he began complying with the service requirement.

¶ 22    The respondent explained that he did not want Curtis Jr. visiting him at the Cook County jail. It was an unhealthy place, and no physical contact was permitted with Curtis Jr., who was then seven months old. The respondent thought he would serve only 30 days and then be released. However, based on his act in removing his electronic monitoring bracelet, he was charged with escape and sent to Sheridan on December 12, 2013.[3]

¶ 23    While at Sheridan, the respondent participated in a substance abuse program and the 24/7 Dads therapy group through West Care. Once he completed the programs, upon his release

[3]In August 2013, while the respondent was on parole from his drug possession conviction, he was charged with driving with a suspended or revoked license. He was released with an electronic monitoring bracelet.

from Sheridan, West Care would provide transitional housing and assistance with job placement. The services the respondent participated in at Sheridan were not connected with the services the court ordered him to participate in, but he felt his participation would demonstrate his commitment to improving himself even before his release. He was able to maintain his sobriety and had not used any illegal drugs since he had been at Sheridan. The respondent's intention upon his release was to go to a transitional home where he would receive help until he was stable enough to obtain a job and an apartment for Curtis Jr. and himself.

¶ 24    The respondent acknowledged that West Care addressed the needs of substance abusers with extensive criminal and substance abuse histories. Due to an incident on August 29, 2014, with another inmate, he served 15 days in segregation and then was placed in "Second Chance." Since he was only a month away from finishing the West Care program, he was not required to restart the program. He chose voluntarily to participate for two additional months to coincide with his scheduled release date of February 4, 2015.

¶ 25    According to the respondent, when he lived with Shanea S., he was involved in Curtis Jr.'s life as his father, attending to his needs by feeding and bathing him, and washing his clothes. He worked at a car wash and provided financially for Curtis Jr.

¶ 26    At the conclusion of the fitness hearing, the trial court ruled that the State failed to prove by clear and convincing evidence that the respondent failed to maintain a reasonable degree of interest, care and responsibility for Curtis Jr. or that he was depraved. The court further ruled that while the respondent had made reasonable efforts to correct the conditions which led to Curtis Jr.'s removal, the State proved by clear and convincing evidence that he failed to make reasonable progress toward correcting those conditions during the nine-month period of May 17, 2013 through February 8, 2014. Therefore, the trial court found the respondent was unfit under section 1(D)(m) of the Adoption Act. 750 ILCS 50/1(D)(m) (West 2014).

¶ 27                                B. Best Interest Hearing

¶ 28    The testimony relevant to the respondent is summarized below.

¶ 29    Sean Cline testified as follows. On March 1, 2013, Curtis Jr. was placed in foster care with Ms. Zenophas Grey.[4] Residing with Ms. Grey was Marvin Coleman, her partner, Zamyla, their five-year-old daughter, and Zaria S. Curtis Jr. integrated well into the family. He demonstrated a strong attachment to both Ms. Grey and Mr. Chapman and enjoyed a sibling relationship with Zamyla. Curtis Jr. had no special needs, and Ms. Grey was attentive to his medical and dental needs and accompanied him to his evaluations every six months. No abuse or incidents involving Curtis Jr.'s safety were reported, and Mr. Cline found Ms. Grey's residence to be age-appropriate for Curtis Jr.

¶ 30    Ms. Grey's mother provided daycare for Curtis Jr. and Zaria S. and Zamyla (the girls) when Ms. Grey was working. The mother provided an appropriate home and interacted well with the children. Curtis Jr. and the girls enjoyed activities such as going to the park and watching movies with Ms. Grey and Mr. Coleman.

¶ 31    According to Mr. Cline, it was in the best interest of Curtis Jr. to terminate the parental rights of Shanea S. voluntarily and to terminate involuntarily the respondent's parental rights. It was also in Curtis Jr.'s best interest that he be adopted by Ms. Grey. Mr. Cline explained that

---

[4]Elsewhere in the record, Ms. Grey is referred to as Curtis Jr.'s godmother.

Curtis Jr. had been in the custody of Ms. Grey for the majority of his life and was well integrated into Ms. Grey's family and extended family life. Ms. Grey demonstrated her ability to care for Curtis Jr.'s needs, and it was in Curtis Jr.'s best interest to achieve permanency through adoption. While there had been some contact with the respondent, Curtis Jr. had developed a strong attachment to Ms. Grey and Mr. Coleman.

¶ 32    Mr. Cline acknowledged that when visiting Curtis Jr., the respondent behaved appropriately. Due to the length of time between visits, Curtis Jr. was initially apprehensive, but did warm up to the respondent and showed no signs of distress while interacting with him. The respondent told Mr. Cline that he was committed to caring and providing for Curtis Jr.

¶ 33    Mr. Cline spoke with the respondent about his plans upon his release from Sheridan scheduled for February 2015. The respondent told him that he wanted Curtis Jr. returned to him. He was in a relationship with a woman whom he believed would be a good mother figure for Curtis Jr. and that the two of them planned to live together and raise Curtis Jr.

¶ 34    Ms. Zenophas Grey testified as follows. Ms. Grey provided foster care for Curtis Jr. as of March 1, 2013. After the first few nights, Curtis Jr. had adjusted very well and had become a part of the family. Ms. Grey and Mr. Coleman participated in activities with Curtis Jr. and the girls, such as playing games, going to movies and making crafts. They attend church as a family and attend events together as a family. Ms. Grey's extended family, including her grandparents, her mother, her uncles and her brother, provided her with assistance in caring for Curtis Jr. and the girls.

¶ 35    Ms. Grey explained that she wished to adopt Curtis Jr. to provide permanency for him. Mr. Coleman and Ms. Grey's extended family supported her decision to adopt Curtis Jr. Ms. Grey was familiar with the respondent and read his letters to Curtis Jr. If the respondent's parental rights were terminated, Ms. Grey would continue to allow contact between Curtis Jr. and the respondent. Based on her own experience of losing her father and being raised by a stepfather, she believed that having two fathers to assist in raising Curtis Jr. was beneficial.

¶ 36    Ms. Grey acknowledged that the respondent visited Curtis Jr. in her home on a regular basis. The respondent played or watched television with Curtis Jr. and had "conversations" with him. The respondent's behavior was appropriate with Curtis Jr. The respondent provided milk and diapers for Curtis Jr., if Ms. Grey needed them, and also brought clothing for Curtis Jr. On one occasion Shanea S. attempted to interfere with the respondent's visitation because they had argued. Ms. Grey informed her that their argument had nothing to do with Curtis Jr., and she would not permit Shanea S. to disrupt the respondent's visitation with Curtis Jr.

¶ 37    Terina Lavette Johnson testified as follows. Ms. Johnson was 22 years of age and worked as a loan specialist for Evon Credit. Prior to working for Evon Credit, she worked at Illinois Action for Children, which provided assistance such as daycare to low-income families. Ms. Johnson and the respondent planned to be married. Prior to the respondent's August 2013 arrest for violating his parole, Ms. Johnson and he lived together. When he is released in February 2015, the respondent will return to live with her and, if the court allows it, Curtis Jr. will live with them.

¶ 38    Ms. Johnson was aware that the respondent was participating in services in connection with the present case. From what she observed of their interaction, there was a bond between Curtis Jr. and the respondent. Ms. Johnson understood that the respondent wanted custody of Curtis Jr., and she agreed that she would assist him in caring for Curtis Jr. The respondent planned to find a good school for Curtis Jr. to attend and to rent a two-bedroom apartment so

that Curtis Jr. could have his own room. Ms. Johnson described herself as a Christian, and she attended church. The respondent attended church with her prior to his incarceration. After his release, Curtis Jr. and they would attend church services together.

¶ 39 Ms. Johnson maintained that the respondent and she would provide a loving and secure home for Curtis Jr. She had a stable income, and the respondent and she would be attentive to Curtis Jr.'s needs and planned to begin his education even before he started attending school. Ms. Johnson's mother and siblings were willing to provide additional support in raising Curtis Jr.

¶ 40 Ms. Johnson acknowledged that while he was on parole, the respondent was required to live with her. In August 2013, he removed his electronic monitoring bracelet. Ms. Johnson denied that the respondent removed the electronic monitoring bracelet because they had a quarrel. She acknowledged that she met Curtis Jr. for the first time at this hearing.

¶ 41 The respondent testified as follows. Acknowledging that he had made mistakes, the respondent maintained that he wanted a chance to be a father to Curtis Jr. He had always wanted children and had helped to raise his 10 nieces and nephews. After he was released from Sheridan, he planned to obtain employment in order to provide for Curtis Jr. He had the assistance of Ms. Johnson, and West Care would provide him with job placement assistance and participation in support groups. The respondent's aunt and sister would also provide support for him in raising Curtis Jr.

¶ 42 Between Curtis Jr.'s birth in October 2012 and respondent's incarceration in November 2012, the respondent developed a bond with Curtis Jr. He recognized that because so much time had passed, he could not say that the bond still existed, but he intended to reestablish it. At the present time, he had no problem interacting with Curtis Jr., playing with him, knowing how to comfort him and how to respond to his crying. At his last visitation, the respondent read stories to Curtis Jr., showed him pictures and finally got him to say "da-da."

¶ 43 The respondent maintained that he would be able to provide a safe environment for Curtis Jr. Ms. Johnson's apartment was located in Cicero, Illinois, and away from areas where violence was a concern. The area had many places suitable for children where he could take Curtis Jr. for activities. The respondent loved Curtis Jr. and believed that he could provide a better home for him than the one Ms. Grey provided.

¶ 44                              C. The Trial Court's Ruling

¶ 45 At the conclusion of the hearing, the trial court found "by a preponderance of the evidence it is not in the best interest of [Curtis Jr.] to terminate the parental rights of [the respondent]." When the State requested a factual basis for its ruling, the court stated as follows:

> "[The respondent] has continually exhibited an interest in the safety and welfare of his son. Prior to his incarceration, he was actually involved in the care and of raising of his son.
>
> During his incarceration he continued to exhibit interest in his son. The foster parent testified to his involvement. The worker testified to his involvement. They both testified to the bond they saw between the father and son.
>
> [The respondent] sought out and successfully became involved in services during his incarceration.

Unfortunately, he has not had an opportunity to exhibit or tell this court what he will do upon his release, but it is this court's opinion that [the respondent] does have an interest in the safety and welfare of his son. That there has been a bond established, that [Curtis Jr.] is just about two years old now.

And I do believe that it is in his best interest to not terminate the interest of his birth father."

¶ 46 On December 26, 2014, Curtis Jr. filed a petition for leave to appeal pursuant to Rules 311(a) and 306(a)(5). On January 13, 2015, this court allowed leave to appeal.

¶ 47 ANALYSIS

¶ 48 I. Standard of Review

¶ 49 A court reviews a best interest determination under the manifest weight of the evidence standard. *In re Austin W.*, 214 Ill. 2d 31, 51-52 (2005). "A finding is against the manifest weight of the evidence where the opposite conclusion is clearly evident." *In re C.N.*, 196 Ill. 2d 181, 208 (2001).

¶ 50 II. Discussion

¶ 51 The right of a parent to raise his or her biological child is a fundamental liberty interest, and the involuntary termination of that right is a drastic measure. *In re B'yata I.*, 2013 IL App (2d) 130558, ¶ 28. To safeguard this right, the Juvenile Court Act of 1987 (Juvenile Court Act) provides a two-step process for the involuntary termination of parental rights. *B'yata I.*, 2013 IL App (2d) 130558, ¶ 28 (citing 705 ILCS 405/2-29(2) (West 2012)). The State must prove that the parent is unfit and if the parent is found unfit, the State then must prove that termination of parental rights serves the best interest of the child. *B'yata I.*, 2013 IL App (2d) 130558, ¶ 28.

¶ 52 Following a finding of unfitness, the issue before the court is no longer whether parental rights can be terminated but, focusing on the needs of the child, whether the parental rights should be terminated. *In re D.T.*, 212 Ill. 2d 347, 364 (2004). As our supreme court recognized "at a best-interests hearing, the parent and the child may become adversaries, as the child's interest in a loving, stable and safe home environment becomes more aligned with the State's interest in terminating parental rights and freeing the child for adoption." *D.T.*, 212 Ill. 2d at 363-64. "[A]t a best interests-hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *D.T.*, 212 Ill. 2d at 364. A child's best interest is superior to all other factors, including the interests of the biological parents. *In re V.M.*, 352 Ill. App. 3d 391, 398 (2004). " 'A child's best interest is not part of an equation. It is not to be balanced against any other interest. In custody cases, a child's best interest is and must remain inviolate and impregnable from all other factors ***.' " *Austin W.*, 214 Ill. 2d at 49 (quoting *In re Ashley K.*, 212 Ill. App. 3d 849, 879 (1991)).

¶ 53 The trial court's finding that a parent is unfit to have custody of his child does not automatically require the termination of the parent's legal relationship with the child. *In re M.F.*, 326 Ill. App. 3d 1110, 1115 (2002). "A child's best interests may be best served by maintaining an already existing relationship with a parent." *M.F.*, 326 Ill. App. 3d at 1115. The State must prove by a preponderance of the evidence that termination of parental rights is in the child's best interest. *Tajannah O.*, 2014 IL App (1st) 133119, ¶ 18. "Proof by a preponderance

of the evidence means that the fact at issue *** is rendered more likely than not." *People v. Houar*, 365 Ill. App. 3d 682, 686 (2006).

¶ 54    Cases involving the termination of parental rights are "*sui generis* and must be decided based on the particular facts and circumstances presented." *In re G.L.*, 329 Ill. App. 3d 18, 26 (2002). Since each termination of parental rights case is unique, factual comparisons to other cases are inappropriate. *G.L.*, 329 Ill. App. 3d at 26. There is a strong presumption in favor of the trial court's best interest determination. *Tajannah O.*, 2014 IL App (1st) 133119, ¶ 20. However, where the court's decision is against the manifest weight of the evidence, the reviewing court has a duty to reverse that decision. *In re Marriage of Hefer*, 282 Ill. App. 3d 73, 79 (1996).

¶ 55    The respondent expressed from the very beginning that he loved Curtis Jr. and wanted custody of him. However, at the best interest hearing, the concern is what is in the best interest of Curtis Jr. We review the evidence in light of the factors set forth in section 1-3(4.05) of the Juvenile Court Act (705 ILCS 405/1-3(4.05) (West 2014)). Section 1-3(4.05) provides that:

"Whenever a 'best interest' determination is required, the following factors shall be considered in the context of the child's age and developmental needs:

(a) the physical safety and welfare of the child, including food, shelter, health, and clothing;

(b) the development of the child's identity;

(c) the child's background and ties, including familial, cultural, and religious;

(d) the child's sense of attachments, including:

(i) where the child actually feels love, attachment, and a sense of being valued (as opposed to where adults believe the child should feel such love, attachment, and a sense of being valued);

(ii) the child's sense of security;

(iii) the child's sense of familiarity;

(iv) continuity of affection for the child;

(v) the least disruptive placement alternative for the child;

(e) the child's wishes and long-term goals;

(f) the child's community ties, including church, school, and friends;

(g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives;

(h) the uniqueness of every family and child;

(i) the risks attendant to entering and being in substitute care; and

(j) the preferences of the persons available to care for the child." 705 ILCS 405/1-3(4.05) (West 2014).

¶ 56    A court need not refer to all of the above factors in its best interest determination. *Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19. Several of the above factors are not applicable in this case because at the time of the hearing, Curtis Jr. was barely two years of age. While no one factor is determinative (*Austin W.*, 214 Ill. 2d at 50), we find that several of the statutory factors compel the determination that termination of the respondent's parental rights would serve Curtis Jr.'s best interest.

¶ 57    The first relevant factor to be considered is the fulfillment of the child's basic needs for food, shelter, safety, health and clothing. There was evidence that the respondent provided food and clothing to Curtis Jr. while he has been in Ms. Grey's care. The respondent also planned to provide a safe environment for Curtis Jr. by moving into Ms. Johnson's apartment in Cicero.

¶ 58    However, the respondent's ability to provide for Curtis Jr. was based on future events. The respondent testified that he planned to get a job with the help of West Care. While the record referred to the respondent's employment at a car wash before he was arrested in August 2013, the respondent did not provide any evidence of job skills or the type of employment he could obtain after his release. Even with West Care's assistance, there is no indication of how long it would take him to obtain employment that would provide sufficient funds to raise Curtis Jr. While Ms. Johnson testified that she had a stable income, she has no legal responsibility to financially support Curtis Jr. In contrast, since March 1, 2013, Ms. Grey has provided a home for Curtis Jr. where his needs have been met, and she wished to adopt Curtis Jr. so that his needs will continue to be met.

¶ 59    The next factor we find relevant is the child's sense of attachment. The State points out that the trial court's reliance on testimony by Mr. Cline and Ms. Grey that there was a bond between Curtis Jr. and the respondent was misplaced as they did not so testify. While Ms. Johnson did testify that a bond existed between Curtis Jr. and the respondent, the respondent himself acknowledged that whatever bond he had with Curtis Jr. when he was born in October 2012 had been lost over time and that he would have to reestablish that bond.

¶ 60    In contrast, Mr. Cline's testimony established that Curtis Jr. had formed a bond with both Ms. Grey and Mr. Coleman. The Grey household provided the only home Curtis Jr. had ever known, having lived there since he was five months old. At the time of the hearing, he was over two years old. Curtis Jr. benefited from the security, familiarity with Ms. Grey and Mr. Coleman as his caregivers and their love and affection as well as that of their daughter, Zamyla. It could not be the "least disruptive placement alternative" for Curtis Jr. to be removed from Ms. Grey's home to begin living with the respondent, with whom he had never spent any time alone or for long periods of time, and Ms. Johnson, whom he had just met at the hearing.

¶ 61    The next relevant factor we consider is Curtis Jr.'s need for permanence. The evidence established that the respondent cannot provide permanence for Curtis Jr. in the near future. The respondent's plans for taking custody of Curtis Jr. are dependent on his maintaining his sobriety and refraining from drugs as well as obtaining employment. It may be some time before the respondent earns sufficient income to support Curtis Jr. While the respondent planned to bring Curtis Jr. to live with Ms. Johnson and him, it is the respondent's responsibility to support Curtis Jr. In the meantime, Curtis Jr. is growing up with his sister, Zaria S., and enjoying a safe and secure home life with Ms. Grey and her family. Most important, in the Grey household, Curtis Jr. has a family that loves him and wants to fulfill his need for permanence by adopting him.

¶ 62    The next relevant factor is the risks of entering and being in substitute care. The evidence established that Curtis Jr. has thrived while being cared for by Ms. Grey and is well acclimated into Ms. Grey's home and family. For Curtis Jr. to remain a foster child, as opposed to an adoption by Ms. Grey, continues the uncertainty of his life and even the potential of being placed with another family.

¶ 63    Finally, we consider the preferences of the persons available to care for Curtis Jr. Ms. Grey desires to adopt Curtis Jr. and to continue to provide him with a family and a life where he is cared for and loved. Ms. Grey also expressed her willingness to allow the respondent continued contact with Curtis Jr. even after the adoption. The respondent seeks custody of Curtis Jr. and asserted that he could provide a better home for Curtis Jr. than Ms. Grey could provide. However, at the present time the respondent is not in a position to provide anything comparable to what Ms. Grey is providing for Curtis Jr., and there is no evidence as to when, if ever, he could provide any kind of home for Curtis Jr. The respondent's statement comparing what he could provide and what Ms. Grey now provides demonstrates the respondent's refusal to recognize the reality of his situation and highlights the fact that his concern is more with his own desires than what is best for Curtis Jr.

¶ 64    In its factual basis for denying the State's petition to terminate the respondent's parental rights, the trial court relied on the respondent's continued interest in caring for Curtis Jr., the existence of a bond between them, and the fact that the respondent has not had an opportunity to demonstrate to the court his abilities as a father. The factual basis relied on by the trial court is not supported by the evidence. Ms. Grey and Mr. Cline did not testify that there was a bond between the respondent and Curtis Jr. While Ms. Johnson did testify that a bond existed between Curtis Jr. and the respondent, the respondent himself acknowledged that whatever bond he had with Curtis Jr. when he was born in October 2012 had been lost over time and that he would have to reestablish that bond.

¶ 65    Moreover, from the trial court's stated concern with the respondent's lack of opportunity to prove his ability to care for Curtis Jr., it is apparent that the trial court balanced the rights of the respondent to maintain his legal relationship with Curtis Jr. against the best interest of Curtis Jr. In doing so, the trial court erred. See *Austin W.*, 214 Ill. 2d at 49 (the child's best interest is not part of an equation and may not be balanced against any other interest). Contrary to the trial court's finding, the respondent was given a chance to be a father to Curtis Jr. between his release from prison in March 2013 and August 2013, when he removed his electronic monitoring bracelet and was again incarcerated. In this case, the preponderance of the evidence established that to afford the respondent a second opportunity to demonstrate his abilities as a parent was not in Curtis Jr.'s best interest, especially his need for permanency. In rejecting clear and convincing as the standard of proof applicable to the best interest determination, the supreme court recognized as follows:

> "[A]n erroneous finding that termination of parental rights is not in the child's best interests results in [the] preservation of the parent-child relationship, to the obvious favor of the unfit parent. Such erroneous finding, however, would also deprive the child of permanency, one of the stated goals of the Juvenile Court Act [citation], and subject the child to the frequently uncertain and fluctuating world of foster care." *D.T.*, 212 Ill. 2d at 365.

¶ 66    The preponderance of the evidence in this case established that Curtis Jr.'s best interest required the termination of the respondent's parental rights. Since the opposite conclusion from that reached by the trial court was clearly evident, the court's decision was against the manifest weight of the evidence.

¶ 67                                    CONCLUSION

¶ 68        The order of the circuit court is reversed, and this case is remanded to the circuit court for entry of an order terminating the parental rights of the respondent and for further proceedings in accordance with that order.

¶ 69        Reversed and remanded with directions.