NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 220501-U

NOS. 4-22-0501, 4-22-0502 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
December 1, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* J.C.-D., and D.K., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Sangamon County |
| Petitioner-Appellee, | ) | Nos. 18JA187 |
| v. | ) | 19JA184 |
| Krystal D., | ) | |
| Respondent-Appellant). | ) | Honorable |
| | ) | Karen Tharp, |
| | ) | Judge Presiding. |

JUSTICE DOHERTY delivered the judgment of the court.
Justices Turner and Zenoff concur in the judgment.

**ORDER**

¶ 1    *Held*: The trial court's findings that respondent was unfit and that termination of the parental relationship was in the best interest of her children were not against the manifest weight of the evidence.

¶ 2    Respondent Krystal D. is the mother of two sibling minors: J.C.-D. (born in 2007) and D.K. (born in 2010). In September 2019, the State filed petitions for adjudication of wardship concerning both children. The minors were adjudicated to be neglected and subsequently made wards of the court. In January 2022, the State filed a petition for termination of parental rights, and in March 2022, the trial court concluded that respondent and the minors' respective fathers were unfit parents. Following a best-interest hearing held in May 2022, the court found it was in the minors' best interest that respondent's parental rights be terminated.

¶ 3 Respondent appeals, claiming the court's findings were against the manifest weight of the evidence. The fathers are not parties to these consolidated appeals.

¶ 4 We affirm.

¶ 5 I. BACKGROUND

¶ 6 A. Initial Filing—Adjudication of Wardship

¶ 7 In September 2019, the State filed a petition for adjudication of wardship of minors J.C.-D. and D.K., alleging that respondent had neglected both of her children because (1) the minors' environment was injurious to their welfare due to their mother's mental health issues, (2) the minors were not receiving the proper care and supervision necessary for their well-being, and (3) the minors were without proper care due to respondent's mental disability. The trial court initially found there was "probable cause" to believe that both minors were neglected in accordance with section 2-3(1) of the Juvenile Court Act (705 ILCS 405/2-3(1)(a) (West Supp. 2019)) and further found it was "of immediate and urgent necessity" to remove the minors from respondent's home and placed in shelter care.

¶ 8 An order of adjudication was entered on February 13, 2020, wherein the trial court found the minors were neglected based upon the three grounds stated in the September 19 petition and ordered that they be placed in the custody and guardianship of the Illinois Department of Children and Family Services (DCFS).

¶ 9 B. Dispositional Hearing

¶ 10 A dispositional hearing was held in February 2020, after which the trial court found that it was in the best interests of the minors to make them wards of the court, found that the minors' parents were "unfit, unable or unwilling for some reason other than financial circumstances alone to care for, protect, train, educate, supervise or discipline" the minors, and

placed them into protective care. Respondent was ordered to cooperate with services, "including mental health services," and to cooperate with "any recommended assessments." The minors were again ordered to be placed in the custody and guardianship of DCFS.

¶ 11                                   C. Permanency Hearing Orders

¶ 12        Following the dispositional hearing, and prior to January 2021, seven orders on permanency review were entered, each following a detailed permanency report submitted by the minors' DCFS case worker. The first six orders each set forth a "permanency goal" of returning the minors to their home. The seventh permanency review order, dated November 17, 2021, changed the permanency goal to finding substitute care for both minors pending a court determination on termination of parental rights based on the permanency report assessment that respondent was "no longer complying with any mental health services, against her doctor's recommendations."

¶ 13                            D. Petition for Termination of Parental Rights

¶ 14        In January 2022, the State filed a petition for termination of parental rights as to both minors. The petition alleged that respondent and both fathers were unfit—again, the fathers are not parties to this appeal. As to respondent, the petition asserted that she was unfit because she (1) had "failed to maintain a reasonable degree of interest, concern, or responsibility" concerning the minors' welfare, (2) had "failed to make reasonable progress toward the return of the minor[s]" to her within nine months after an adjudication of neglect/abuse/dependent, specifically, from February 4, 2021, to November 4, 2021, and (3) was "unable to discharge parental responsibilities due to mental impairment or mental illness," and that there was "sufficient justification to believe that the inability to discharge parental responsibilities shall extend beyond a reasonable time period." The petition further requested that, in the best interest and welfare of the minors, the

parental rights of respondent and the minors' respective fathers be terminated and that DCFS be "appointed as Legal Guardian with the power to consent to the adoption" of the minors.

¶ 15                                    E. Hearing on Parental Fitness

¶ 16          A hearing to determine parental fitness was held on March 31, 2022, with testimony received from Dr. Joel Eckerd (a clinical psychologist), Dr. Mastan Indlamuri (respondent's primary care physician), DCFS case workers Elizabeth Collins and Jenny Metzroth, respondent, and one of the minors' fathers.

¶ 17                                          1. *Dr. Eckerd*

¶ 18          Dr. Eckerd, a privately employed clinical psychologist retained by DCFS, performed a psychiatric evaluation of respondent in December 2020 and diagnosed her with schizoaffective disorder. According to Dr. Eckerd, it is "one of the most difficult to treat" and involves "an affective illness—like depression and anxiety"—and a "thought disorder, psychosis." He explained, a "thought disorder" is "when you see or hear things that other people don't." Hallucinations are a symptom of psychosis. He testified that her condition is treated "with medication and with psychotherapy to help the client manage their disorder."

¶ 19          Respondent underwent a series of cognitive tests during her psychiatric evaluation, including verbal comprehension, perceptive reasoning, computation, ability to process visual material, spelling, sentence comprehension, concentration, reading comprehension, and a personal assessment inventory, and a Jesness inventory, and she scored very low. Her IQ tested at 74. According to Dr. Eckerd, respondent exhibited a "moderate level of psychopathy" and "anti-social traits," and "her system of values appears to be poorly developed, sense of right and wrong." Moreover, her Child Abuse Inventory results "suggested that she tends to parent in a rigid manner," which he described as demanding age-inappropriate behavior from her children.

- 4 -

¶ 20    According to Dr. Eckerd, respondent received a monthly injection of Invega—an anti-psychotic medication—to treat her schizoaffective disorder and took an anti-depressant. He said the use of injections is "almost always due to a client's history of non-compliance with psychiatric treatment." He added, "It's just easier to give them injections once a month; that way if they wake up one morning and say, I'm not taking my medicine or I don't feel good or I don't want to take it and don't take it, with the injectables it doesn't matter."

¶ 21    Dr. Eckerd opined that he had "significant reservations about her parenting ability, particularly due to her history, as I understand it, would suggest lack of cooperation with treatment and follow-through with treatment." He agreed that his reservations of her inability to parent would "extend beyond a reasonable time period." He added, failing to receive regular treatment "would make it very difficult for [respondent] to parent in a minimally adequate and nurturing fashion."

¶ 22                            2. *Dr. Indlamuri*

¶ 23    Dr. Indlamuri, respondent's primary care physician from 2018 until late 2021, testified that respondent suffered from depression with psychosis. He explained that she had been hospitalized in 2019 "for not being on medications and having uncontrolled psychosis." It was at that time she began her Invega injections, he said. Dr. Indlamuri testified that respondent had missed a few injections between February 2021 and November 2021 and that as of September 2021, she told him she no longer wanted to receive the injections. He denied telling her that she did not need the injections; he opined that she needed to see a psychiatrist. According to Dr. Indlamuri, "[s]he didn't want to get anymore injections" and she thought "she was wrongly diagnosed" and did not need "any more psychiatric medications." The doctor told respondent, "[I]t's an ongoing problem. You had this for a long time, and you need to be on the medications." He said respondent had complained that she developed an abscess at the injection site, but he

explained the injection could be given elsewhere. Dr. Indlamuri said that respondent was "not a good patient to be on oral medication that needed to be taken every day."

¶ 24                                    3. *Case Workers—Collins and Metzroth*

¶ 25        DCFS case worker Elizabeth Collins worked with the two minors from February 2021 through May 2021. She testified that respondent had inconsistent treatment with injections and had issues with stable housing, noting that there was a time when respondent's house was infested with cockroaches. Each of these interfered with the return-home option. Collins testified that during her time as the minors' case worker she did not feel comfortable returning the minors to their mother or father, and that, as to respondent, it was because "her mental health treatment was inconsistent, and we were not able to determine if it was a safe placement," and due to "significant mental health diagnoses." She explained, "[I]t was recommended by her physician that she had to remain consistent with her Invega injections or they were not effective. And due to her diagnosis of schizoaffective disorder, she cannot provide satisfactory supervision for her children without having the stability of the medications."

¶ 26        DCFS case worker Jenny Metzroth worked with the minors briefly in 2020 and again from May 2021 forward. She testified that respondent was no longer willing to take pills or injections despite her physician's recommendations to do so. She testified that respondent had been evicted for non-payment of rent and that, upon obtaining a new home, its lack of any furnishings interfered with visits. Metzroth testified that she never felt comfortable returning the minors to respondent because "her mental health treatment was inconsistent, and not all recommendations were being followed from her doctor and her psychological assessment." She said, "the biggest concern that led to the kids coming into care was symptoms related to mental health."

¶ 27                                    4. *Respondent Krystal D.*

¶ 28        Respondent acknowledged she discontinued her Invega injections in September 2021 and stated that she did not have schizoaffective disorder, just "depression." She also testified that she had been cooperative during her medical treatment and with DCFS.

¶ 29                               F. Ruling on Parental Fitness

¶ 30        At the conclusion of the parental fitness hearing, the trial court found the State had proven by clear and convincing evidence that respondent was unfit for failing to make reasonable progress towards the return of the minors to her care. The same finding was also made respecting the two fathers. Referencing the prior adjudication hearing, over which the trial judge presided, the court said that respondent "left children without proper supervision. She checked herself into the hospital. She was having hallucinations for a significant time period." The court stated that respondent "has had mental issues for a substantial period of time," including depression. The court continued, stating that respondent acknowledged that she had depression, but does not acknowledge the other aspects of her diagnosis of schizoaffective disorder, "but clearly has exhibited the symptoms" of that condition.

¶ 31        The trial judge stated, "Dr. Eckerd was clear she needs very extensive treatment, consistent, ongoing. She needs consistent ongoing medication." The judge then stated that "it was in September that she came in, basically said, I'm not going to do this anymore." She continued, "There was no medical testimony that she was having any reaction, negative reaction to the medication. She decided she didn't want it." According to the court, "by November of '21, she was not adequately engaged in treating her significant issues."

¶ 32        For these reasons, the court concluded that the State had met its burden that respondent was unable to discharge her parental responsibilities because of her mental illness and

that there were "sufficient justifications to believe that the inability to discharge those parental responsibilities would extend beyond a reasonable time period." It further found that respondent was "not adequately addressing her mental health issues" and was not taking a reasonable degree of responsibility as to the minors' welfare. In its written order, the trial court held that respondent, by clear and convincing evidence, was an unfit person to parent the minors and found the State had proven all three of its allegations of unfitness.

¶ 33                                    G. Hearing on Best Interests

¶ 34          In May 2022, the trial court conducted a best-interest hearing and heard testimony from DCFS case worker Jenny Metzroth and respondent. Metzroth testified that she had been the minors' case worker for a short time during 2020 but had been their case worker since May 2021. She reiterated that the minors had been placed in a traditional foster home in Springfield since September 2019 and said that both boys' educational, medical, mental, and social needs were being met by the foster parent and that each had established a bond with the foster parent and felt comfortable talking with her about issues. She said respondent had regular visits with the minors, and they were permitted to contact their other siblings. Metzroth said that responded needed to engage with her sons more during visits and testified that respondent would "often just kind of sit and observe" and that as a result, the children would end up playing video games or doing things on their phone.

¶ 35          Metzroth opined that she did not believe that a "road to permanence" with a return home option could be accomplished within a reasonable period of time and that the situation was such that a return to home was not an option. Metzroth cited respondent's ongoing mental health concerns and stated, "[O]ver the life of the case it's been an ongoing problem, and it's been two-and-a-half years now, and we're not to where it feels like it's resolved." She continued, "[S]o

the likelihood of it resolving in the next few months, or even six months, it seems unlikely." She concluded her testimony by agreeing it was in the minors' best interest to terminate the parental rights of both respondent and of the minors' fathers.

¶ 36　　　　Respondent testified as well, stating that she loved her children and believed she was able to take care of them and provide for them. She said she had a job and a house and would make sure the minors continued in their activities and got to school. She acknowledged, though, that she had switched doctors and that she had not informed DFCS and had not signed a release so DCFS could obtain medical and psychiatric records from her new physicians. She also admitted she is no longer attending counseling and that she is not taking medication for her diagnosed schizoaffective disorder. She also admitted she had not provided her new psychiatrist any of the medical reports from Dr. Eckerd regarding her schizoaffective disorder.

¶ 37　　　　　　　　　　H. Ruling on Best Interests

¶ 38　　　　After considering the evidence and arguments of counsel, the trial court determined it was in the best interests of the minors to terminate respondent's parental rights for respondent and both fathers. In rendering her oral ruling, the trial judge noted that respondent's condition, as diagnosed by Dr. Eckerd, "is difficult to treat, particularly because she has a history of a lack of cooperating with treatment, a lack of followthrough [*sic*]." The trial court stated that respondent had stopped the injections and had been dishonest about why she had done so; the court felt that respondent was also not forthright about whether she had asked for and could take the medication in a pill form. The judge further observed that respondent had failed to provide DCFS with records release forms and that she has a history of not cooperating.

¶ 39　　　　The court also voiced concern over respondent's failure to interact with her minor children. The court stated, "[S]he doesn't recognize the difference between [not wanting to push

- 9 -

her children] and just normal interaction with the children in the short time that you have with them in a visit to engage with them." The court added, "She doesn't make that distinction, which I think goes back to the diagnosis that she has and the difficulty that she has and would have with parenting."

¶ 40    The court then observed, "[B]oth of the children's needs are being met in the foster home, their identity for the past two-and-a-half years has been in this foster home. They are maintaining sibling contact, they do feel secure, they go to the foster parent when they have certain needs." The court continued, "[T]he least-disruptive placement alternative is for them to stay where they are. I do not have a sense that a placement with mother would be at all stable, that their needs would be met by her." The trial judge then stated that K.D. "wants to be adopted. Permanence with these children is very important, as it is with every child." The judge continued, "It is time for these children to have permanence" and "it is in the best interests of both of the minors that the parental rights" of both parents be terminated.

¶ 41    The court's May 12, 2022, permanency hearing order found that "it is in the best interest" of the two minors to set the permanency goal of adoption. The order further gave DCFS the power to consent to the minors' adoption and that said adoption would be binding on respondent without any further notice or consent of respondent or either of the fathers. A "Best Interest" order, entered that same date, found that "it is in the best interest" of both minors that respondent's parental rights be terminated.

¶ 42    This appeal followed.

¶ 43                                    II. ANALYSIS

¶ 44    On appeal, respondent challenges the trial court's fitness and best-interest findings, claiming they were against the manifest weight of the evidence.

- 10 -

¶ 45        For the reasons stated below, we affirm.

¶ 46                        A. Timeliness of Disposition

¶ 47        Before addressing the merits, we pause to address the timeliness of this court's disposition of the appeal. This case is accelerated pursuant to Illinois Supreme Court Rule 311(a)(5) (eff. July 1, 2018), which provides, in pertinent part, "[e]xcept for good cause shown, the appellate court shall issue its decision within 150 days after the filing of the notice of appeal." Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018). In this case, we find the existence of good cause for the disposition being issued a few days outside the prescribed deadline. Counsel for respondent was late in filing both the docketing statement and respondent's brief, meaning that the court's time to consider this appeal was truncated.

¶ 48                        B. Fitness

¶ 49        At the fitness portion of the hearing on termination of parental rights, it is the State's obligation to prove by clear and convincing evidence that the parent is "unfit" under one or more of the grounds provided by section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020); 705 ILCS 405/2-29(2), (4) (West 2020)). *In re AL. P. v. Angel P.*, 2017 IL App (4th) 170435, ¶ 40. In reviewing the trial court's decision, we do not retry the case; instead, we are limited to deciding whether the trial court's finding of unfitness is against the manifest weight of the evidence. *In re J.H.*, 2020 IL App (4th) 200150, ¶ 68. A decision is against the manifest weight of the evidence only if the facts clearly demonstrate that the trial court should have reached the opposite result. *In re J.B.*, 2019 IL App (4th) 190537, ¶ 33.

¶ 50        In discussing the areas in which the trial court found respondent to be unfit, the common overlapping issue is her mental health and the failure to address it. As noted by the trial court, the statutory language is disjunctive, so "any of these three elements may be considered on

its own as a basis for unfitness." See *In re Jaron Z.*, 348 Ill. App. 3d 239, 259 (2004). An adverse finding on any one ground is sufficient to support a finding of unfitness. *In re C.W.*, 199 Ill. 2d 198, 217 (2002) (citing *In re D.D.*, 196 Ill. 2d 405, 422 (2001)).

¶ 51 The trial court found that respondent was unfit under three separate provisions of the applicable statute: (1) she failed to make reasonable progress toward return of the child to the home (750 ILCS 50/1(D)(m) (West 2020)); (2) she failed to demonstrate a reasonable degree of interest, concern, or responsibility as to her children's welfare (*id.* § 1(D)(b)); and (3) she failed and was unable to discharge her parental responsibilities due to mental impairment or mental illness and such inability is expected to extend beyond a reasonable time period (*id.* § 1(D)(p)).

¶ 52 "Reasonable progress" is an objective standard; it means that a parent has made progress by complying with directives given for the return of the child such that the court will be able to return the child to parental custody in the near future. *In re F.P.*, 2014 IL App (4th) 140360, ¶ 88. In her brief on appeal, respondent fails to even acknowledge that lack of progress was a basis for the trial court's finding of unfitness. However, the trial court expressly stated that it had reviewed the initial orders in the case and respondent's progress. The court acknowledged that respondent had attended parenting classes and had been receiving Invega injections for a time but eventually stopped. The court concluded that by November of 2021, respondent was "not adequately engaged in treating her significant issues," and "the Court would not have been able to place either child back in her care by November of '21."

¶ 53 Respondent offers no argument why this finding was against the manifest weight of the evidence; we conclude that it was not. The central underlying issue for respondent in all respects was her struggle to deal with mental illness. Not only did she stop taking the medications

which might have given her a chance to succeed, she failed to accept her diagnosis. The prospects for a successful reunification in the near future were dim.

¶ 54        As noted above, our affirmance of one basis for finding respondent's unfitness is sufficient to sustain the trial court's finding of unfitness. *In re C.W.*, 199 Ill. 2d at 217. There is, therefore, no need to examine the other two bases found by the trial court: failure to show a reasonable degree of interest and the failure to discharge parental responsibilities due to mental illness. We note, however, that many of the same facts would be relevant to consideration of these factors as well.

¶ 55                          C. Best Interests

¶ 56        We now move to review of the trial court's finding that it was in the best interests of the minors that the parental relationship with respondent be terminated. "[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d 347, 364 (2004). The determination of whether the termination of parental rights serves a minor's best interests relies on the consideration of several factors including: "(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural[,] and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child." *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1072 (2006); see also 705 ILCS 405/1-3 (4.05) (a)-(j) (West 2020).

¶ 57　　　　　　The State bears the burden of proving by a preponderance of the evidence that termination of parental rights is in the minor's best interest. *In re D.T.*, 212 Ill. 2d at 366. "A reviewing court affords great deference to a trial court's best-interest finding because the trial court is in a superior position to view the witnesses and judge their credibility." *In re J.B.*, 2019 IL App (4th) 190537, ¶ 33. Consequently, we will not reverse a trial court's best interests finding and termination of parental rights unless it is against the manifest weight of the evidence. *In re C.P.*, 2019 IL App (4th) 190420, ¶ 68.

¶ 58　　　　　　Respondent argues that the trial court misapplied or ignored several of the applicable factors. However, the trial court is not required to explicitly mention each factor when rendering its decisions, and the failure to do so does not suggest that the trial court ignored any of the statutory factors. See *In re Deandre D.*, 405 Ill. App. 3d 945, 954-55 (2010).

¶ 59　　　　　　While respondent concedes that the children were safe in their placement, she felt that the trial court failed to adequately consider their welfare "later in life," as they feel a need to unify their families. Looking at this matter in isolation, it would be entirely defensible if the trial court felt that the children's immediate safety and welfare were more weighty concerns than the abstract hopes of reunification in the future. "Following a finding of unfitness, however, the focus shifts to the child. The issue is no longer whether parental rights *can* be terminated; the issue is whether, in light of the child's needs, parental rights *should* be terminated. Accordingly, at a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d at 364 (Emphases in original.). We find no error in the trial court giving greater weight to the children's immediate need for a "stable, loving home life" than it did to the benefits of a possible future reunification.

¶ 60        Respondent also argues that the children need permanence and, because they have lived with their mother for most of their lives, "permanence" is not well served by placing them with someone besides their mother. But this begs the question, as it assumes that a return to respondent's care would better serve her children's interests. It is important to consider whether respondent can provide permanence for her children "in the near future." See *In re Curtis W., Jr.*, 2015 IL App (1st) 143860, ¶ 61. Respondent's failure to address her mental health issues—specifically her failure to accept her diagnosis and administer the medications that might help her cope—gives no reason to believe that she would be able to meet her children's needs anytime soon. Recall that "permanence" in this context includes the need for stability and continuity of relationships with parent figures and siblings. *In re Daphnie E.*, 368 Ill. App. 3d at 1072.

¶ 61        Additionally, respondent argues that the trial court failed to consider her own preference for reunification of the family. However, it is clear to us that the trial court well understood respondent's position and desires, but it also understood that the issue was whether the respondent's unification proposal was in the best interest of the children. The fact that the trial court did not agree with respondent's position does not mean it failed to consider it.

¶ 62        Finally, on a related matter, respondent has advanced an argument premised on speculation about the race of the foster parent, but she concedes that the record is silent on this point. As the issue is not supported by the record, we need not consider this argument.

¶ 63        A best-interest determination is against the manifest weight of the evidence only if the facts clearly demonstrate that the trial court should have reached the opposite result. *In re J.B.*, 2019 IL App (4th) 190537, ¶ 33. Here, we conclude that the trial court's best-interest determination is not against the manifest weight of the evidence.

¶ 64                         III. CONCLUSION

¶ 65        For the reasons stated, we affirm the trial court's judgment.

¶ 66        Affirmed.