# Illinois Official Reports

## Appellate Court

---

### *In re J.V.*, 2018 IL App (1st) 171766

---

| | |
|---|---|
| Appellate Court Caption | *In re* J.V., E.V., G.V., ISRAEL C., and ISAAC C. JR., Minors-Respondents-Appellees (People of the State of Illinois, Petitioner-Appellee, v. Alyssa G., Francisco V., and Isaac C. Sr., Respondents-Appellants). |
| District & No. | First District, Fifth Division<br>Docket Nos. 1-17-1766, 1-17-1768, 1-17-2137 cons. |
| Filed<br>Rehearing denied | September 28, 2018<br>October 23, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, Nos. 16-JA-661 through 16-JA-665; the Hon. Maxwell Griffin Jr., Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Amy P. Campanelli, Public Defender, of Chicago (Eileen T. Pahl, Assistant Public Defender, of counsel), for appellant Alyssa G.<br><br>Bruce H. Bornstein, of Chicago, for appellant Francisco V.<br><br>Thomas M. O'Connell, of Schaumburg, for other appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg and Nancy Kisicki, Assistant State's Attorneys, of counsel), for the People. |

Charles P. Golbert, Acting Public Guardian, of Chicago (Kass A. Plain and Christopher Williams, of counsel), for respondents-appellees.

Panel                    JUSTICE HALL delivered the judgment of the court, with opinion.
                         Justices Hoffman and Lampkin concurred in the judgment and opinion.


**OPINION**

¶ 1    This is an accelerated appeal under Illinois Supreme Court Rule 311(a) (eff. July 1, 2018). The respondent parents, Alyssa G. (Alyssa), Francisco V. (Francisco) and Isaac C. Sr. (Isaac), filed three separate appeals challenging the orders of the circuit court of Cook County, finding them unfit, terminating their parental rights, and finding that it was in the respondent minors' best interests to appoint a guardian with the right to consent to their adoption. The three appeals were consolidated for our review.

¶ 2    In his appeal, Francisco contends that (1) the State failed to establish it was in the minors' best interests to expedite the termination of his parental rights and (2) the trial court erred in finding him unfit for behaving in a depraved manner. In her appeal, Alyssa contends that (1) she was denied due process and unfairly prejudiced when the trial court elicited and relied on unsworn testimony by three of the respondent minors, or, in the alternative, she received ineffective assistance of trial counsel, (2) the admission of prior consistent statements was error, and (3) the termination of her parental rights was not in the best interests of the minor respondents. In his appeal, Isaac contends that (1) the trial court's abuse and neglect findings against him were against the manifest weight of the evidence, (2) there was insufficient evidence to support the trial court's findings that he was unfit and that his parental rights must be terminated, and (3) expediting the termination of his parental rights was improper. For the reasons set forth below, we affirm the orders of the circuit court.

¶ 3    Pursuant to Rule 311(a)(5), this court was required to issue our decision within 150 days after the filing of the notice of appeal, except for good cause shown. Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018). In this appeal, we granted multiple extensions of time for the filing of the record and the briefs. While these extensions delayed the filing of our decision, in each case, the parties' requests were made for legitimate reasons and not to hinder the timely resolution of this appeal.

¶ 4                              BACKGROUND
¶ 5                               I. Facts
¶ 6    Alyssa and Francisco are the parents of J.V., born in July 2006; E.V., born in February 2008; and G.V., born in August 2009 (collectively the minors). Alyssa and Isaac are the

parents of the twins, Isaac C. Jr. and Israel C. (the twins), born July 2016. Alyssa was also the mother of M.A., deceased, born in January 2012. Giovanni C. was the father of M.A.[1]

¶ 7    In April 2012, Alyssa was arrested and charged with child endangerment after Chicago police discovered the minors asleep in an unheated vehicle. The minors and M.A., who had been left in the care of a friend of Alyssa, were placed in foster care. Alyssa pleaded guilty to child endangerment and was sentenced to 18 months' supervision. By August 2015, the minors and M.A. had been returned to her custody, and in November 2015, the circuit court closed the case. On July 29, 2016, while living with Alyssa, Isaac, and the minors, four-year-old M.A. died. On July 30, 2016, Alyssa gave birth to the twins.

¶ 8    On August 2, 2016, Alyssa and Isaac were seen fleeing from a burning abandoned building. Chicago police officers discovered M.A.'s body in the building and arrested Alyssa and Isaac.

¶ 9                    II. Circuit Court Proceedings

¶ 10    On August 5, 2016, the State filed petitions for adjudication of wardship and motions for temporary custody of the minors and the twins. The petitions sought expedited termination of parental rights. See 705 ILCS 405/2-21(5) (West 2016) (providing for termination of parental rights at the first dispositional hearing). On August 24, 2016, the State brought a delinquency petition against Isaac, then 17 years of age,[2] alleging one count of attempted residential arson and two counts of concealment of a death. On September 16, 2016, the State filed amended petitions for the minors and the twins.

¶ 11    With regard to the minors, Alyssa was alleged to be unfit based on (1) repeated or continuous substantial neglect of a child in the household, which resulted in the death of that child; (2) extreme and repeated cruelty; (3) failure to protect the child from an injurious environment; and (4) depravity. See 750 ILCS 50/1(D)(d-1), (e), (g), (i) (West 2016). Francisco was alleged to be unfit due to depravity. See 750 ILCS 50/1(D)(i) (West 2016). With regard to the twins, Alyssa and Isaac were alleged to be unfit based on (1) abandoning the twins at the hospital,[3] (2) repeated or continuous substantial neglect of a child residing in the household resulting in the death of that child, and (3) depravity. See 750 ILCS 50/1(D)(a-1), (d-1), (i) (West 2016).

¶ 12                         A. Adjudication

¶ 13    Evidence as to the allegations of abuse and neglect and unfitness was presented at hearings on November 18, 2016, and December 30, 2016.

¶ 14                         1. *November 18, 2016*

¶ 15    At the November 18, 2016, hearing, the State presented exhibits in support of the petition for neglect and abuse of the minors and the twins, including the August 2, 2016, electronic recording of Alyssa's interview with Chicago Police detectives regarding the discovery of M.A.'s body and the August 17, 2016, electronic recordings of the minors' individual victim

---

[1]Giovanni C. was not a party to the proceedings below or to this appeal.

[2]Isaac turned 18 years of age on November 20, 2016.

[3]The State later withdrew the abandonment allegation.

sensitive interviews conducted by Elizabeth Perez of the Children's Advocacy Center. The electronic exhibits were admitted into evidence. The contents of the interviews are summarized below.

¶ 16                          a. Alyssa's Interview With Chicago Police Detectives

¶ 17      During the interview with the detectives, Alyssa stated that she had taken M.A. to a doctor because he was not gaining weight. The doctor had prescribed Pediasure. On July 29, 2016, she tried but failed to resuscitate M.A., who had stopped breathing. Alyssa placed M.A.'s body in the shower, hoping to revive him. She denied that anyone had abused M.A. prior to his death. Alyssa told the detectives that Isaac and she took M.A.'s body to an abandoned building on July 30, 2016. She then went to the hospital and gave birth to the twins. Later, Alyssa claimed that Isaac, his brother, and she carried M.A.'s body to the abandoned building shortly before they were arrested. Alyssa claimed that she waited outside the building while Isaac and his brother went inside with the body.

¶ 18      Alyssa insisted that neither Isaac nor his brother had anything in their hands. She denied knowing that either of them had a fire accelerant in their possession. She did not know a fire had been started until the fire department arrived.

¶ 19                              b. Victim Sensitive Interviews
¶ 20                                        J.V.
¶ 21      Ten-year-old J.V. had been playing video games with Isaac and Christian, Isaac's brother, when Alyssa asked him to check M.A.'s pulse and heartbeat to determine if he was dead. After J.V. confirmed that M.A. was dead, Alyssa and Isaac washed the body in the shower. After wrapping the body in a towel and clothes, they placed it on Alyssa's bed and then in J.V. and E.V.'s room. When the body began to smell, Alyssa put the body in the trunk of her car and used air freshener to mask the odor. J.V. overheard Isaac suggest to Alyssa that they use Isaac's baseball bat to crush M.A.'s skull and knock out his teeth to prevent his identification. Alyssa's and Isaac's first attempt to burn M.A.'s body was unsuccessful. Alyssa blamed Isaac for the failed attempt.

¶ 22      Alyssa disciplined M.A. for soiling himself. M.A. was forced to sleep in a storage room. Previously, J.V.'s dog, Ray, had been kept in that storage room, but Ray died from the cold and starvation. Alyssa also took M.A.'s clothes away because he kept soiling himself, saying that he would have to earn his clothes back. M.A. would scream and cry, but Alyssa responded telling him to "shut up." Sometimes M.A. would be fed, but other times he would steal food from the refrigerator. Alyssa became angry when she discovered that J.V. had given M.A. food. J.V. saw Alyssa beating E.V. with a shoe. J.V. saw M.A. had a black eye, and M.A. told him Alyssa had struck him.

¶ 23                                        E.V.
¶ 24      Eight-year-old E.V. described how M.A. was kept in a back storage room; a dog named Ray had been kept there until it froze to death. M.A. slept in a litter box, which contained cat feces. After the litter box was thrown away, M.A. slept on the floor of the storage room. E.V. described M.A. as looking hot, tired, sad, and hungry. Alyssa and Isaac were responsible for feeding M.A. While sometimes M.A. did not want to eat, Alyssa and Isaac did not always

feed him. M.A. would yell from the storage room that he was hungry. He would steal food or beg food from the neighbors, for which he was punished. Alyssa would yell at E.V. if he gave M.A. food. E.V. described M.A. as very skinny, and his face was so thin that it resembled a triangle.

¶ 25     Alyssa often beat M.A. with a coat hanger or a belt. M.A. had lots of scabs on his back, and he had a black eye after Alyssa struck him.

¶ 26     When M.A. died, Alyssa told J.V. and E.V. that Isaac and she were going to burn M.A.'s body. The first time they tried, they were almost caught by police. Alyssa and Isaac argued about the failed attempt. At one point, Isaac complained that he was only 17, and the situation was too much for him. Alyssa and Isaac put M.A.'s body in the trunk of their car. When it began to smell, Alyssa used air freshener to mask the smell. When they went to pick up Alyssa after she had the twins, Isaac said he wanted to use a bat on M.A.'s body.

¶ 27     G.V.

¶ 28     G.V. was within five days of her seventh birthday when she was interviewed by Ms. Perez.

¶ 29     M.A. used to sleep in one of the bedrooms, but he was moved to the storage room because his urinating and defecating made the apartment smell. M.A. slept on the floor of the storage room because there was no bed. A dog named Ray had died during the winter in the storage room.

¶ 30     Alyssa would often beat M.A. with a coat hanger because he soiled himself. G.V. described Isaac as "mean" to M.A. Isaac would give him water sometimes, but Alyssa told Isaac not to give water to M.A. if he soiled himself. Alyssa also beat E.V. and J.V.

¶ 31     M.A. stole food at night. Once Alyssa found out that G.V. had given M.A. some cereal. Alyssa told her it was okay to feed M.A. Alyssa did not allow him to steal food.

¶ 32     G.V. believed that M.A. died because he was not fed and given water. She knew that M.A.'s body had been wrapped up and placed in the trunk of Alyssa's car. E.V. was afraid that M.A. would come back to life.

¶ 33                              c. Additional Exhibits

¶ 34     Also admitted into evidence were autopsy photographs of M.A., a certified copy of Alyssa's 2012 conviction for child endangerment, and the medical examiner's report, which listed the cause of death for M.A. as homicide by unspecified means.

¶ 35     Certified copies of Francisco's felony convictions were also admitted into evidence. In June 2006, he pleaded guilty to possession of between 30 and 500 grams of cannabis and was sentenced to 18 months in prison; in May 2011, he pleaded guilty to and was sentenced to 3 years in prison for possession of a firearm by a gang member; and in May 2015, he pleaded guilty to and was sentenced to 7 years in prison for the manufacture and delivery of between 15 and 100 grams of cocaine.

¶ 36                              2. *December 30, 2016*

¶ 37     At the December 30, 2016, hearing, the parties stipulated that, in November 2016, Isaac admitted the allegations in the delinquency petition. The testimony of the witnesses at that

hearing is summarized below.

¶ 38                                                    Alyssa

¶ 39       Alyssa invoked her constitutional privilege against self-incrimination on both direct and cross-examination.

¶ 40                                                   Julia V.

¶ 41       Julia V. (Julia) is Francisco's mother and the paternal grandmother of the minors. After his release from prison in April 2016, Francisco moved in with her. In addition to helping her with cleaning and cooking, he is employed doing snow removal, working for a janitorial service, and is a bouncer at a lounge.

¶ 42       Julia described Francisco as a loving father who is involved in all aspects of the minors' lives. He plays with them, talks to them about school, cooks for them, and takes care of their needs. While Francisco was incarcerated, he would keep in contact with the minors by telephone calls two or three times a month and by letters. Julia knew he missed the minors during his incarcerations because he would get very emotional in his conversations with them.

¶ 43       Julia acknowledged that Francisco had been a member of the Latin Kings street gang. While a gang member, he had been shot and suffered head trauma and a broken jaw. Julia was aware that Francisco was on parole until April 19, 2019. Julia further acknowledged that Francisco had other children but he did not have custody of them. She denied that E.V. was upset because Francisco had a Caucasian son. Julia further denied that J.V. was proud that Francisco taught him the Latin Kings' handshake or that J.V. and E.V. liked being with Francisco because they enjoyed watching pornographic movies, hitting women, and being in gangs.

¶ 44                                                   Lucy V.

¶ 45       Lucy V. (Lucy) is Francisco's younger sister and paternal aunt to the minors. Lucy is a certified nursing assistant and a medical records assistant. Since Francisco's release from prison in April 2016, she had seen him approximately 20 times a month, mostly at family gatherings either at her home or Julia's home. Francisco interacted well with Lucy's three children.

¶ 46       Lucy described Francisco's relationship with the minors as that of a typical father. Francisco was an authoritative figure when it was appropriate, but he also played with the minors. He gave them advice when necessary, such as not to fight or say mean things to each other.

¶ 47       At the present time, Lucy was renting a house in Joliet, Illinois, with the hopes that Francisco and the minors would live with her family. Her children interacted well with the minors.

¶ 48       Lucy and Julia fully supported Francisco. Lucy had even applied to be a foster parent for the minors. Lucy confirmed Julia's testimony that, while he was in prison, Francisco kept in touch with the minors by telephone calls and letters.

¶ 49 Lucy maintained that Francisco loved the minors and despite his three incarcerations was a good father to them. She acknowledged that each time he was released from prison, Francisco would say he was going to be a better father to the minors.

¶ 50 Lucy recounted that sometimes, Alyssa would just disappear. When that happened, Francisco would drop whatever he was doing and take care of the minors. Lucy maintained that Francisco's arrest in May 2016 for drinking in public with a known gang member was the result of stereotyping.

¶ 51 Since Francisco was released from prison in April 2016, he displayed more maturity and responsibility. Lucy described her family members as very close to one another. Lucy denied that she would lie or make up facts to help Francisco.

¶ 52                                                    Francisco

¶ 53 Francisco confirmed that he was employed: he did snow-plowing and worked as a janitor, jobs which gave him flexible working hours. On weekends, he worked as a bouncer at a lounge, checking identifications and keeping order.

¶ 54 Francisco missed three visits with the minors because he lacked transportation and because of his job responsibilities. Francisco advised Susan Hipp, the minors' caseworker, of his transportation problems, but she did not offer him any assistance. He had quit a previous job because it interfered with his visitation, and he now had a car.

¶ 55 Francisco interacted with the minors by playing with them and talking to them about school and what they are learning. The minors would ask him for advice.

¶ 56 Francisco was no longer involved in a gang; his last gang involvement was at the time of his 2012 arrest. He maintained that the crimes of which he was convicted and sent to prison had nothing to do with the minors.

¶ 57 Since he was now employed, Francisco planned to work toward a career. He was currently going to school to be a professional truck driver. Francisco's plan was for the minors and him to live with Lucy and her children.

¶ 58 Francisco denied telling Lucy after his first release from prison that he intended to change, but he admitted he had told her that he would change after serving his second and third periods of incarceration. He maintained that, with respect to the 2012 child endangerment case, he was not required to complete any services by the Department of Children and Family Services (DCFS).

¶ 59 Francisco joined the Latin Kings street gang when he was 12 years old and left the gang when he was 26. While he was in the gang, he was shot in his left hand and suffered a broken jaw and head trauma when he was hit by a glass bottle.

¶ 60 Francisco had three other children with different women. Francisco did not have custody of these children but supported them financially. Francisco did not keep a record of his support contributions.

¶ 61 Francisco acknowledged that on May 25, 2016, he was arrested and charged with drinking alcohol in public with a known gang member. He refused to clarify whether he pleaded guilty or there was a trial, only that he was released for time served.

Chicago Police Officer Gillespie

¶ 63     On the evening of August 2, 2016, Officer Gillespie and his partner, Officer Price, were dispatched to 1403 Marquette Road in Chicago. Upon arriving, Officer Gillespie observed a single-family residence that appeared uninhabited. Proceeding to the back of the residence, Officer Gillespie exited the police vehicle and approached the house from the alley. He observed two males running away from the building: one was wearing a White Sox jersey, and the other was wearing red shorts. Officer Gillespie stopped the individual in the White Sox jersey. That individual's last name was C***. That individual was eventually placed under arrest by another officer. In the meantime, Officer Price was pursuing another individual.

¶ 64     Officer Gillespie identified Isaac as one of the two individuals he saw that evening, but he was unsure whether Isaac was the individual he detained. Officer Gillespie did not notice any damage to the property or anything unusual about the property. He did not see anyone exiting the building.

¶ 65                          Chicago Police Officer Price

¶ 66     On the evening of August 2, 2016, Officer Price was working with Officer Gillespie when they were dispatched to 1405 West Marquette Road.[4] Upon arrival in the area, a witness told the officers that three Hispanic or Mexican individuals were trying to burn down a building and directed them to the exact location of the building. After parking their police vehicle in the alley, they exited the vehicle. Officer Price then observed a female individual. The individual looked at Officer Price and began running. She climbed over a fence to the property next to 1405 Marquette Road. Officer Price pursued the individual and stopped her. The officer identified the individual as Alyssa. Alyssa had nothing in her hands. Officer Price placed her in handcuffs and took her back to the police vehicle.

¶ 67                                   Susan Hipp

¶ 68     Ms. Hipp is employed as a child welfare specialist by Lutheran Child and Family Services (LCFS). Since August 9, 2016, she has been the caseworker for the minors and the twins.

¶ 69     Ms. Hipp reviewed the 2012 case file, which revealed that Francisco had not completed any services. A new integrated assessment was conducted on August 23, 2016. Francisco was found in need of the following services: mental health assessment, domestic violence assessment, substance abuse assessment, individual therapy, random drug drops, parenting education, and successful completion of his parole.

¶ 70     Ms. Hipp arranged six random drug drops for Francisco to perform between August 2016 and December 2016. For each drug drop, she contacted him by telephone and either spoke with him or left a voice message. Ms. Hipp explained to Francisco that a missed drop counted as positive for drugs. He did not perform any of the drug drops.

¶ 71     On September 12, 2016, Ms. Hipp referred Francisco for individual therapy at Pathways. He was to meet with the therapist every Monday. Francisco attended three sessions, the latest

---

[4]The police officers' testimony differed as to the number of the abandoned house on West Marquette.

one in October 2016. When Ms. Hipp questioned Francisco about the missed sessions, he told her he thought he was finished. Francisco did complete the mental health assessment.

¶ 72    Ms. Hipp had not referred Francisco for a domestic violence assessment or parenting classes. She explained that it was preferable for him to begin with the individual therapy. Since he failed to participate in the drug drops, a determination as to whether he had a substance abuse problem was still necessary before he would benefit from the additional services that were indicated for him.

¶ 73    According to Ms. Hipp, Francisco had scheduled visitation with the minors weekly for two hours. Between August and November 2016, he consistently visited the minors. His visits stopped for about four weeks and then resumed in December 2016. Ms. Hipp made several attempts to contact him about the missed visitation. Francisco did not return her telephone calls, but he did respond to her December 5, 2016, letter. Francisco called and told her that he had been working and "other stuff had happened."

¶ 74    Ms. Hipp denied that Francisco told her he missed visitation because he had no transportation. Had he asked for assistance, he would have been provided with a bus card or fuel cards if he had a car.

¶ 75    The minors reacted differently to the missed visits. J.V. would be angry if Francisco missed visits, while E.V. would just say that he missed his dad and wanted to see him. G.V. had to be coaxed into participating in the visits with Francisco and never complained about not going to visit him.

¶ 76                            Francisco's Rebuttal Testimony

¶ 77    Francisco explained that the drug drops were randomly scheduled. Ms. Hipp would call while he was at work. By the time he received her message, he could not get to the test site in time. On one occasion, Ms. Hipp gave him the wrong location for the test. When he went to visit the minors, Francisco explained to her why he missed the drug drops.

¶ 78    As a condition of his parole, Francisco had to do drug drops. If he violated that condition, he would be sent back to prison. While Francisco had done the six drug drops scheduled by his parole officer, he admitted that he had not done the six drug drops he was required to do in this case. He denied using any illegal substances in the past six months.

¶ 79    Francisco had requested visitation with the minors for Halloween. Although one of the foster parents was agreeable, Ms. Hipp refused his request. When Francisco requested services, Ms. Hipp explained that, because the case was being expedited, he would not have time to complete them.

¶ 80    Francisco completed the three visits needed for the mental health assessment. He understood that he was to get a referral after the assessment was completed, but he never received one. Since the therapist did not contact him to tell him he needed further therapy, he believed he had completed the individual therapy requirement.

¶ 81                            3. *Adjudication and Unfitness Rulings*

¶ 82    On February 17, 2017, the trial court determined as to Alyssa that, based on the exhibits in evidence and the testimony of the witnesses, there was clear and convincing evidence that "all of the children were the subject of an injurious environment ***. [The minors] were abused with a substantial risk of physical injury."

¶ 83    The trial court found by clear and convincing evidence that as to the minors and the twins, Alyssa was unfit on the statutory grounds that (1) she substantially neglected a child residing in her household, that such neglect was continuous or repeated, and such neglect resulted in the death of that child; (2) she committed extreme or repeated cruelty to the child; (3) she failed to protect the child from conditions in the child's environment injurious to the child's welfare; and (4) she behaved in a depraved manner. See 750 ILCS 50/1(D)(d-1), (e), (g), (i) (West 2016).

¶ 84    While Francisco's three felony convictions raised a rebuttable presumption that he was guilty of depravity, the trial court found that he had produced evidence rebutting the presumption. Nonetheless, even in the absence of the presumption, the trial court found that there was clear and convincing evidence establishing that, as to the minors, Francisco was unfit in that he behaved in a depraved manner. See 750 ILCS 50/1(D)(i) (West 2016).

¶ 85    On February 28, 2017, the trial court found, as to the twins, "by clear and convincing evidence that there was neglect by injurious environment." The court explained that the abuse and neglect that existed in the Alyssa/Isaac household were the bases for its findings of anticipatory abuse and neglect. The court further found that there was "also abuse[,] substantial risk of injury[,] based on the facts in this case."

¶ 86    The trial court found by clear and convincing evidence that Isaac was unfit in that "he substantially neglected a child residing in his household. Such neglect has been continuous or repeated and such neglect resulted in the death of a child and, finally, (i), that he behaved in a depraved manner." See 750 ILCS 50/1(D)(d-1), (i) (West 2016).

¶ 87                    B. Dispositional Hearings and Rulings
¶ 88    The dispositional hearing was conducted over two dates: February 28, 2017, and May 16, 2017. The testimony of the witnesses at the hearings is summarized below.

¶ 89                         1. *February 28, 2017*
¶ 90                              James M.
¶ 91    James M. (James) was 53 years old and had been J.V. and E.V.'s foster parent during the proceedings in the 2012 case. They returned to his care in August 2016. At the time of the hearing, James had three other boys, aged 15, 13, and 9 living with him. Two of them he had adopted, and proceedings were underway for him to eventually adopt the nine-year-old.

¶ 92    James and J.V. played board games and watched television together. J.V. had friends and spent time with them. James maintained daily contact with school officials to make sure that they understood that J.V. needed special consideration because of what he witnessed when he lived with Alyssa and Isaac. James also made sure that J.V.'s particular medical needs were addressed.

¶ 93    James described his relationship with J.V. as that of a "parent." In addition to his basic needs for food, clothing, and shelter, James provided emotional comfort when J.V. had nightmares. James wished to adopt J.V. because he loved him and wanted to ensure that he never again experienced the trauma to which he was exposed.

¶ 94    James wished to adopt E.V., whom he described as "awesome," if somewhat bossy. In his last report card, E.V. received straight A's. He worked very hard to be "perfect" and to please James, almost to the point of concern.

¶ 95    James described J.V. and E.V. as having a typical brother relationship with the other boys living in the home. J.V. and E.V. shared a bedroom with one of the other boys, and they all played together. While there had been some issues with the boys getting along, there was nothing that could not be resolved very quickly. All the boys were very respectful and understood James's role as a parent.

¶ 96    In the event something happened to him, James explained that there were many individuals who wished to care for J.V. and E.V. James had assistance from friends and other parents who watched J.V. and E.V. when he needed a night out.

¶ 97    James had a financial advisory practice, and he conducted business at his residence. When he needed to visit clients, he made it a point to do so while J.V. and E.V. were at school.

¶ 98    James explained to Francisco that he was not looking to take J.V. and E.V. away from him. His decision to adopt J.V. and E.V. was based on his love for them as well as the need for them to have a home.

¶ 99    James was unaware that J.V. had been baptized in the Roman Catholic faith. He had not taken J.V. or E.V. to church. James was raised in the Roman Catholic faith and was familiar with the doctrines of the church. James and J.V. had discussed Catholicism about 5 to 10 times.

¶ 100    James was aware that J.V. and E.V. were of Mexican-American descent. He did not speak Spanish to them, but he knew some Spanish words and encouraged them to speak Spanish. James introduced J.V. and E.V. to a neighbor who was a Spanish-speaking teacher, and he talked to J.V. and E.V. about joining different clubs at school. James believed that both J.V. and E.V. were distancing themselves from their heritage and their past lives, but he encouraged them to accept their heritage even though it was difficult.

¶ 101    James would allow J.V. and E.V. to remain in contact with their grandmother, Julia. He had not permitted J.V. and E.V. to visit their cousins. James wanted J.V. and E.V. to have a relationship with their biological families. J.V. and E.V. knew that Francisco had other sons, and they would like to visit them. However, DCFS had not authorized such visits.

¶ 102    James explained that in view of what they experienced, J.V. and E.V. were reluctant to attend church services. James believed he could discuss their questions and concerns regarding belief in God. He had never denied J.V.'s or E.V.'s request to be taken to church.

¶ 103                                    Fred R.

¶ 104    Fred R. (Fred) and his wife, Jennifer, both 45 years of age, had been the foster parents for G.V. for a total of three years and three months. They had been her foster parents during the pendency of the 2012 case. Fred is an information technical director, and Jennifer works as a receptionist.

¶ 105    At the time of the hearing, G.V. was in the first grade. G.V. did very well in school, academically, behaviorally, and socially. Initially, she was behind her grade level in reading, but she received extra help and was now ahead of her progress goal. In addition to attending school, G.V. played with her friends, and Fred and Jennifer planned activities for her on the weekends.

¶ 106     G.V. had some medical issues: she was born with a horseshoe kidney, meaning her kidneys did not completely separate, and an enlarged bladder. The latter requires regular doctor visits.

¶ 107     Fred described his relationship with G.V. as that of father and daughter. By this time, G.V. knew Fred's and Jennifer's other family members, and she is considered part of the family. If Fred and Jennifer are allowed to adopt G.V., they would provide a plan for G.V.'s care in the event something happened to them.

¶ 108     At the time of the hearing, G.V. had visits with J.V., E.V., and the twins. Fred and Jennifer were in favor of continuing the sibling visits if they adopted G.V. Fred neither encouraged nor discouraged G.V. from maintaining contact with her grandmother, Julia. He was unsure whether there had been any telephone contact or visits between G.V. and Julia.

¶ 109     Fred explained that G.V. attended a Protestant church with them. G.V. enjoyed going to church, and he believed that God was very important to her. Fred had never taken her to a Roman Catholic church service. If she wished to attend another church when she is older, Fred and Jennifer would support her decision.

¶ 110     Fred had spoken very little Spanish to G.V. Some of her friends might be Hispanic. G.V. had become acquainted with their neighbors who were Hispanic.

¶ 111     Fred and Jennifer wished to adopt G.V. because they loved her, and she was part of their family.

¶ 112                             Linda I.

¶ 113     Linda I. (Linda), age 45, and her husband, Steve, age 52, are the foster parents for the twins. While they work outside of the home, Linda is a teacher and is able to have the twins with her at work.

¶ 114     The twins were four weeks old when they were placed with Linda and Steve in August 2016. Though premature, the twins were thriving, and their motor skills were on target for premature babies. Israel was getting physical therapy to strengthen his core muscles, and he was exceeding the level of progress expected. The twins had not developed any new medical issues since their placement with Linda and Steve.

¶ 115     There had been sibling visits with the minors. In the event Linda and Steve are permitted to adopt the twins, Linda would consider continuing those visits, but the decision would depend on the twins' needs. Linda intended to tell the twins that they were adopted. Before she did, Linda planned to consult with a therapist for the best way to explain to the twins their various family relationships.

¶ 116     Linda wished to adopt the twins because she loved them and considered them to be part of their family. In the event that something should happen to Linda and Steve, Linda's brothers would care for the twins.

¶ 117     Linda had not been provided with any information as to the twins' biological family's cultural traditions, family history, or religious traditions. She had not received any information about extended family members.

¶ 118                             Susan Hipp

¶ 119     Every 30 days, Ms. Hipp visited each of the homes in which the minors and the twins were placed. At these visits, Ms. Hipp met face-to-face with the minors and the twins. There

were no signs of abuse or the use of corporal punishment. There were no signs that the minors and the twins were at risk of harm. The minors' and the twins' medical, dental, hearing, and vision needs were met.

¶ 120    Ms. Hipp maintained contact with the schools the minors attended. The minors were doing well in school. J.V. and E.V. were enrolled in an English as a second language program. The minors received individual therapy on a weekly basis. Ms. Hipp learned from their therapist that J.V. and G.V. were more open to talking in the first sessions. Lately, J.V. resisted therapy, while G.V. was less willing to talk about the past events. E.V. was reluctant to talk about anything that brought him into the care of the DCFS.

¶ 121    With respect to sibling visitation, the minors and the twins were together at least once a month for four hours. The visits were supervised by the foster parents. Since no concerns had arisen, LCFS recommended that the visits continue. Due to a no-contact order, Alyssa was not permitted to visit the minors. DCFS concluded and LCFS agreed that neither Alyssa nor Isaac should have visitation with the twins.

¶ 122    Francisco attended 20 out of the 26 visits scheduled with the minors. Ms. Hipp supervised the visits between August and November. J.V. appeared to enjoy the visits, while G.V. was very shy. E.V. interacted one-on-one with everybody. Francisco expressed deep concern over the trauma the minors had suffered. He seemed to know the minors very well and was familiar with their individual character traits. Lately, E.V. had some issues with Francisco, saying that he did not like him and did not have to listen to him.

¶ 123    Neither Alyssa nor Isaac was assessed for services because their respective attorneys requested that LCFS caseworkers not speak with them. Otherwise, they would have been assessed and referred for services.

¶ 124    The August 23, 2016, integrated assessment recommended a number of services for Francisco. Accordingly, Ms. Hipp referred Francisco for a mental health assessment, which he completed, and for individual therapy sessions. He failed to attend all of the individual therapy sessions and was discharged as unsuccessful from the program. Ms. Hipp also referred Francisco for random drug drops, but he failed to appear for them. Francisco informed Ms. Hipp that he would consent to having his parole officer provide a substance abuse assessment. In September 2016, Ms. Hipp was told by Francisco's parole officer that Francisco had not yet completed the substance abuse assessment. In October 2016, she contacted Francisco's parole officer again but was told he was no longer Francisco's parole officer. When Ms. Hipp asked Francisco who his parole officer was, he told her he did not know.

¶ 125    In January 2017, Ms. Hipp had conversations with J.V., E.V., and G.V. about the potential termination of Alyssa's and Francisco's parental rights and adoption. J.V. told Ms. Hipp that he wished to be adopted by James, and he was frustrated by the delays in the case. E.V. said he wished to live with Alyssa. If that was not possible, he wanted to be adopted by James. E.V.'s third choice was to live with Julia. G.V. wanted to be adopted by Fred and Jennifer. In any event, she wished to continue to live with them.

¶ 126    Ms. Hipp never assessed Julia's home for possible placement. In August 2016, Julia informed Ms. Hipp that her residence was not conducive to having the minors live there unless some remodeling was done. Since that time, no remodeling had been done to Julia's house. In November 2016, Ms. Hipp learned from Francisco that Lucy had a new residence, but she never considered it for placement.

¶ 127    At a January 2017 LCFS staffing, it was recommended that all parental rights to the minors and the twins be terminated, and in the best interests of the minors and the twins, the goals for them were changed to adoption.

¶ 128                                    2. *May 16, 2017*
¶ 129                                         Francisco
¶ 130    In the future, Francisco wanted to provide love and guidance to the minors so that they did not make the mistakes he had made. Francisco has weekly two-hour visits with the minors. During his weekly visits with the minors, he helps them with their homework and spends time with them. Education was very important, and he wanted them to go to college. Francisco wanted the minors to live with him at Lucy's residence where they would have the companionship of their cousins who were of similar ages. The minors also enjoyed time with Julia, their paternal grandmother. Just before the July 2016 events, the whole family had gone to the Wisconsin Dells for a weekend vacation. Francisco agreed that long-term stability was important for the minors' well-being.

¶ 131                                          Lucy
¶ 132    Lucy described the vacation to the Wisconsin Dells with her children, Francisco and the minors, and Julia and her boyfriend. The children all got along very well. Lucy was told that M.A. was with his mother.
¶ 133    Lucy lived in a four-bedroom house that Julia and she rented with the idea that the minors would live there with Lucy and her children and become a part of the family. Lucy believed that the minors were safer with their biological family but agreed that stability was important for the minors. She acknowledged that, since August 2016, the minors had not spent any time at her residence. Lucy was unaware of any problems with the minors in 2012 and did not attempt to obtain custody of them during the pendency of the 2012 case.

¶ 134                                          Julia
¶ 135    Julia loved the minors and wanted to provide them with emotional, financial, and educational support. The minors loved and respected Francisco. Julia talked to the minors about school and the family's Mexican traditions. The minors have always spent time with Lucy's children.
¶ 136    Julia had been unaware of the 2012 DCFS case involving the minors until Alyssa finally told her about it. She began visiting the minors in 2013. Julia could not take custody of them since she lived in a one-bedroom apartment and was unable to move.

¶ 137                                        Susana M.
¶ 138    Susana M. (Susana) is the paternal great-grandmother of the twins. Isaac is her grandson and had lived with her between the ages of one and six. She is Mexican, and only Spanish is spoken in her home. Susana is Roman Catholic, and the family celebrates many religious holidays. The twins would be part of the family.
¶ 139    Susana was aware that Isaac admitted the allegations of the juvenile delinquency petition. But she was unaware that Isaac had nine pending delinquency cases. While Susana had conversations with Isaac, he never told her he was involved in any criminal activity. She was

concerned about his relationship with Alyssa because of the age difference.

¶ 140                                     Isaac

¶ 141    Isaac identified a letter he wrote to the trial court. He denied receiving any assistance in writing the letter, and no one reviewed the letter to check his spelling, grammar, or content. The letter and the juvenile justice mental health treatment plan for Isaac were admitted into evidence.

¶ 142                              3. *Dispositional Ruling*

¶ 143    On June 22, 2017, the trial court issued its dispositional order. Based on its prior findings of unfitness as to all three of the parents, the trial court found that, for reasons other than financial circumstances alone, Alyssa, Francisco, and Isaac were unable to care for, protect, train, or discipline the minors or the twins; reasonable efforts had been made to eliminate the need to remove the minors or the twins from the home; and appropriate services aimed at family preservation and reunification had been unsuccessful. The court further found that it was in the best interests of the minors and the twins that Alyssa's, Francisco's, and Isaac's parental rights be terminated and that the minors and the twins be made wards of the court and placed in the custody and guardianship of the DCFS guardianship administrator with the right to consent to their adoption.

¶ 144                              C. Best Interests

¶ 145    Following its dispositional ruling, the trial court stated as follows:

"Okay. Now, the Court has taken much best interest testimony. I still have some questions. And I believe under our statute and case laws, I have the ability in resolving these matters to ask for additional information.

* * *

I want [the minors] to come in. I do not want caseworker or therapists to discuss permanency with these kids until further order of the Court; okay?

* * *

The courtroom will be cleared except for the attorneys, and I will talk to the kids one at a time. I will have questions. You will not have the ability to ask questions; okay?

I will say for the record, I want to find out certain facts from the kids' perspective, and I do not want them to be in a situation where they're being questioned or pressured or feel they're pressured to make decisions.

I will not ask them where they want to live. *** It's not what they're being brought in for. They're being brought in so I can explore certain things that came up in the testimony, and I want to get their perspective; okay?"

¶ 146    When Francisco's attorney asked if he could submit questions for the trial court to ask the minors, the court agreed he could submit them, but it would decide whether to ask those questions. The court further agreed that after it had spoken with the minors, there would be a conference with the attorneys, at which time the attorneys could suggest additional questions in areas they thought should be brought out and that would aid the court.

¶ 147                              1. *Trial Court's Interviews With the Minors*

¶ 148       On July 14, 2017, the trial court interviewed each of the minors in the presence of the court reporter, the guardian *ad litem*, and the parties' attorneys. The court's questions and the minors' answers are summarized below.

¶ 149                                              J.V.

¶ 150       J.V. attended Mokena Intermediate School, where he was going into the fifth grade. His favorite subject was mathematics. J.V. lived with James during the pendency of the 2012 case and again after M.A. died. He understood that he probably would not be going back to live with Alyssa. J.V. wished to live with James because he was well treated and felt safe with him. J.V. felt like James was his real father. J.V. did not have a strong relationship with his grandmother, aunt, or his cousins, but he still wished to see them. James and he had discussed continuing the contact with Francisco's family, and James was agreeable. James was Mexican, and J.V. felt connected with his own heritage. J.V. wished to be a doctor in the future.

¶ 151                                              E.V.

¶ 152       In the fall, E.V. would be in fourth grade at Mokena Intermediate School, where J.V. attended. He enjoyed reading and wanted to be a police officer when he grew up. At the present time he lived with James, which was where he wanted to be. E.V. explained that James loved and cared for him. He was not sure how he felt about Francisco, Alyssa, and Lucy, but he still cared about his grandmother, Julia. But he wished to live with James, where he felt safe.

¶ 153                                              G.V.

¶ 154       G.V. was going into the second grade. Her favorite subject was mathematics. G.V. took horseback riding lessons and had taken third place in a horse show the day before. She lived with Jennifer and Fred; she lived with them during the 2012 case. G.V. wished to live with Fred and Jennifer; she felt safe with them. Francisco did not know how to take care of her. She talked to her therapist about why she was not with Francisco and Alyssa. The therapist helped her deal with her family situation; G.V. agreed that it did help to talk with someone.

¶ 155       The minors had no questions for the trial court. The attorneys had no additional questions they wished the court to ask the minors.

¶ 156                              2. *Best Interests Ruling*

¶ 157       Following its interviews with the minors, the trial court reiterated its findings that it was in the best interests of the minors and the twins that Alyssa's, Isaac's, and Francisco's parental rights be terminated and that the DCFS guardianship administrator be appointed with the right to consent to their adoptions. The court entered the goal of adoption for the minors and the twins.

¶ 158       Francisco, Alyssa, and Isaac filed separate notices of appeal. The appeals were consolidated for our review.

¶ 159                           ANALYSIS
¶ 160                      I. Francisco's Appeal
¶ 161     Francisco contends that the State failed to establish that it was in the best interests of the minors to expedite the termination of his parental rights. He further contends that the evidence was insufficient to support the finding that he behaved in a depraved manner.

¶ 162                       A. Best Interests
¶ 163                     1. *Standard of Review*
¶ 164     Review of a trial court's determination that it is in the child's best interest to terminate parental rights is conducted under the manifest weight of the evidence standard. *In re B.B.*, 386 Ill. App. 3d 686, 697 (2008). The court's determination is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or the determination is unreasonable, arbitrary, or not based on the evidence presented. *B.B.*, 386 Ill. App. 3d at 697-98.

¶ 165                        2. *Discussion*
¶ 166     Francisco argues that the State failed to establish that it was in the best interests of the minors that his parental rights be terminated at the initial disposition hearing since none of the statutory factors set forth in section 1-2(1) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-2(1) (West 2016)) were met. However, section 1-2(1) is a statement of policy limiting expedited termination proceedings to aggravated circumstances. *In re Tyianna J.*, 2017 IL App (1st) 162306, ¶ 70. This court rejected the proposition that section 1-2(1) of the Act controls when expedited termination may take place. *Tyianna J.*, 2017 IL App (1st) 162306, ¶ 63. Instead, the reviewing court looks to whether, at the time of the termination of parental rights, the conditions set forth in section 2-21(5) of the Act have been met and the parent was given a meaningful opportunity to be heard as to those conditions. *Tyianna J.*, 2017 IL App (1st) 162306, ¶ 71; see 705 ILCS 405/2-23(7) (West 2016) (the court may terminate parental rights at the initial dispositional hearing provided all the conditions of section 2-21(5) are met).

¶ 167     The conditions for an expedited termination of parental rights are as follows: (1) the original or amended petition contains a request for termination of parental rights and appointment of a guardian with power to consent to adoption; (2) the trial court has found by a preponderance of evidence introduced or stipulated to at an adjudicatory hearing that the child comes under the jurisdiction of the court as an abused, neglected, or dependent minor; (3) based on clear and convincing evidence admitted at the adjudication hearing, the court finds that the parent is an unfit person pursuant to section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2016)); and (4) the trial court determines in accordance with the rules of evidence for dispositional proceedings, that (a) it is in the best interest of the minor and the public that the minor be made a ward of the court and that reasonable efforts under section 5(*l*-1) of the Children and Family Services Act (Family Services Act) (20 ILCS 505/5(*l*-1) (West 2016)) are inappropriate or such efforts were made and were unsuccessful and (b) the termination of parental rights and the appointment of a guardian with power to consent to adoption is in the best interest of the minor pursuant to section 2-29 (705 ILCS 405/2-29 (West 2016)). 705 ILCS 405/2-21(5) (West 2016).

¶ 168    Francisco claims that the trial court erred when it found that reasonable efforts were made and were unsuccessful. He maintains that the trial court's early termination decision was based on the circumstances surrounding M.A.'s death. Francisco points out that he had no involvement in M.A.'s death and that he did not have custody of the minors. He argues that the period from the filing of the petitions and the hearings was too brief for the trial court to conclude that reasonable efforts were unsuccessful.

¶ 169    Under section 5 of the Family Services Act, DCFS must make reasonable efforts to eliminate the need to remove the minor from the minor's home and to reunite the family. However, section 5 makes clear that "the best interests of the child require that the child be placed in the most permanent living arrangement as soon as is practically possible." 20 ILCS 505/5(*l*-1) (West 2016). The overriding concern of the legislature was expressed in section 5 as follows:

> "When determining reasonable efforts to be made with respect to a child, as described in this subsection, and in making such reasonable efforts, the child's health and safety shall be the paramount concern." 20 ILCS 505/5(*l*-1) (West 2016).

¶ 170    The evidence supported the trial court's finding that reasonable efforts to reunite Francisco and the minors were made but failed. At the time of J.V.'s birth, Francisco was in prison. He returned to prison in May 2011, at which time J.V. and E.V. were five and two years of age. Alyssa at that time was pregnant with G.V. At the time of his latest incarceration in May 2015, J.V. was nine, E.V. was six, and G.V. was three. Each time he was released from prison he would maintain that he was ready to change, only to return to prison as his criminal activity continued. Following his latest release in April 2016, he made the same vow, yet he was arrested in May 2016 for drinking alcohol on the street with a known gang member. In addition, Francisco will be on parole until 2019.

¶ 171    Francisco and his family members, Julia and Lucy, testified that he loved his children. However, his criminal background, repeated incarcerations, failure to complete the therapy, and failure to comply with the required drug testing do not indicate an inclination or understanding of his parental responsibilities and reflect negatively on his ability to safeguard the health and safety of his children. Moreover, Francisco's plan to have the minors and him live with Lucy and her family does not meet the goal of the most permanent living arrangement available. Since August 2016, the minors have lived with their foster parents who cared for them between April 2012 and August 2015. To relocate them to Lucy's home would be the third placement, and its permanency is largely dependent on whether Francisco can successfully complete his parole or otherwise avoid a return to prison. As we have observed, Francisco's past efforts were unsuccessful.

¶ 172    While Francisco offered his own version of why he missed visiting with the children, failed to complete therapy and failed to submit to drug testing, the trial court was not required to credit his version over that of the State's witness, Ms. Hipp. "[T]he trial judge, as the trier of fact, is in a superior position to the reviewing court to observe the conduct of the witnesses while testifying, to determine their credibility, and to weigh and determine the preponderance of the evidence." *People v. A Parcel of Property Commonly Known as 1945 North 31st Street, Decatur, Macon County, Illinois*, 217 Ill. 2d 481, 510 (2005).

¶ 173    At the time the trial court terminated Francisco's parental rights, there was sufficient evidence that reasonable efforts had been made to effectuate the goals of reuniting Francisco with the minors as a family and to provide them with a permanent living situation. He was

given an opportunity to address those issues at the hearing, but it was clear from the evidence that Francisco's own actions contributed to the failure of those efforts. Regardless of his good intentions, the minors' health and safety, the overriding concern in these cases, were better served by terminating his parental rights at the earliest possible time.

¶ 174    We find no error in the trial court's expedited termination of Francisco's parental rights.

¶ 175                                    B. Depravity
¶ 176                                1. *Standard of Review*
¶ 177    The trial court's determination that a parent is unfit is reviewed under the manifest weight of the evidence standard. *In re Shanna W.*, 343 Ill. App. 3d 1155, 1165 (2003); *In re Latifah P.*, 315 Ill. App. 3d 1122, 1128 (2000). " 'A decision regarding parental fitness is against the manifest weight of the evidence where the opposite result is clearly the proper result. [Citation.]' " *Shanna W.*, 343 Ill. App. 3d at 1165 (quoting *Latifah P.*, 315 Ill. App. 3d at 1128)).

¶ 178                                   2. *Discussion*
¶ 179    The State alleged that Francisco was an unfit parent based on the ground of depravity. 750 ILCS 50/1(D)(i) (West 2016). Our courts have held that depravity may be shown where a parent engages in a course of conduct indicating a moral deficiency and an inability to conform to accepted morality. *Shanna W.*, 343 Ill. App. 3d at 1166. Under the Adoption Act, there is a rebuttable presumption that a parent is depraved if the parent has been convicted of at least three felonies under the laws of this state and at least one of these convictions took place within five years of the filing of the petition for the termination of parental rights. 750 ILCS 50/1(D)(i) (West 2016).

¶ 180    "A rebuttable presumption creates 'a *prima facie* case as to the particular issue in question and thus has the practical effect of requiring the party against whom it operates to come forward with evidence to meet the presumption.' " *In re J.A.*, 316 Ill. App. 3d 553, 562 (2000) (quoting *Diederich v. Walters*, 65 Ill. 2d 95, 100 (1976)). "The only effect of the rebuttable presumption is to create the necessity of evidence to meet the *prima facie* case created thereby, and which, if no proof to the contrary is offered, will prevail." *J.A.*, 316 Ill. App. 3d at 563 (citing *Diederich*, 65 Ill. 2d at 102). If evidence opposing the presumption is presented, the presumption ceases to operate, and the case is determined on the basis of the evidence presented, as if the presumption never existed. *J.A.*, 316 Ill. App. 3d at 562. There is no fixed rule as to how much evidence is required to meet the presumption: the stronger the presumption, the greater the amount of evidence is required to rebut it. *J.A.*, 316 Ill. App. 3d at 563.

¶ 181    Francisco does not dispute that the State established the presumption of depravity. He maintains that he rebutted the presumption when he presented evidence that he was working and going to school to support his family, including his children from other relationships. When incarcerated he maintained contact by telephone calls with the minors and sending them letters. While there was evidence that he failed to comply with the drug testing in this case, he maintains that he complied with the testing as a condition of his parole and no evidence was presented that he failed those tests. Finally, he points out that the offenses he committed did not involve children or violence and he was no longer involved in a gang.

¶ 182    We find *In re T.S.*, 312 Ill. App. 3d 875 (2000), instructive. In that case, the respondent father argued that his six prior felony convictions failed to prove that he was deficient in a moral sense and that he was not willing to conform to accepted moral standards. The reviewing court found that the respondent father had not rebutted the presumption created by his felony convictions, stating as follows:

> "Although [the respondent father] testified that he was going to change when he got out of prison because T.S. III needed him, the evidence showed that he continued to commit crimes when he had three other children who presumably needed him." *T.S.*, 312 Ill. App. 3d at 878.

¶ 183    Rehabilitation can only be shown by a parent who, upon leaving prison, maintains a lifestyle suitable for parenting children safely. *Shanna W.*, 343 Ill. App. 3d at 1167. In that case, the reviewing court upheld the trial court's determination that the respondent mother was unfit on the ground of depravity based on her felony convictions. The court found that the respondent mother could not establish rehabilitation because the felonies that gave rise to the initial depravity presumption caused her to be incarcerated for a lengthy time period, which the court pointed out "was respondent's fault." *Shanna W.*, 343 Ill. App. 3d at 1167.

¶ 184    "The statutory ground of depravity requires the trier of fact to closely scrutinize the character and credibility of the parent and the reviewing court will give such a determination deferential treatment." *J.A.*, 316 Ill. App. 3d at 563. Francisco notes that his crimes did not involve violence and they were not crimes directed at children. When he was released from prison in 2016, he promised to lead a better life and pointed out that he was working and going to school now to support his family.

¶ 185    While the trial court found that Francisco had rebutted the presumption that his felony convictions established depravity, there was clear and convincing evidence establishing his unfitness on that basis. As each of the minors was born, Francisco made himself unavailable to his children by continuing to commit crimes, which resulted in his incarceration. His various periods of incarceration deprived his children of his presence when they needed him. Francisco's promises to lead a better life had been made and broken several times. Even after his latest release from prison, he was charged with drinking in public with a gang member. Like T.S. III, the minors should not have to wait until Francisco keeps his promise to turn his life around before their lives are stabilized. See *T.S.*, 312 Ill. App. 3d at 878 (in terminating the respondent father's rights, the trial court stated that T.S. III required stability in his life and should not have to wait until the respondent father turned his life around).

¶ 186    We conclude that the trial court's finding that Francisco was unfit based on the ground of depravity was not against the manifest weight of the evidence.

¶ 187                                    II. Alyssa's Appeal

¶ 188    Alyssa contends that (1) she was denied due process by the trial court's admission of the unsworn and incompetent testimony of the minors into evidence, (2) she was prejudiced by the admission of prior consistent statements, and (3) the termination of her parental rights was not in the best interests of the minors and the twins.

¶ 189                              A. Due Process

¶ 190                            1. *Standard of Review*

¶ 191      The court reviews *de novo* whether a party has been denied due process and, if so, whether the denial was prejudicial. *People v. K.S.*, 387 Ill. App. 3d 570, 573 (2008).

¶ 192                              2. *Discussion*

¶ 193      Constitutional issues are not exempt from the forfeiture rules. "In civil cases, constitutional issues not presented to the trial court are deemed forfeited and may not be raised for the first time on appeal." *Sherman v. Indian Trails Public Library District*, 2012 IL App (1st) 112771, ¶ 21. In *In re M.S.*, 2018 IL App (1st) 172659, ¶ 1, the respondent mother claimed she was denied due process where the trial court held a conversation with the minor outside the presence of the parties and their attorneys. This court held that the respondent mother failed to preserve the alleged error for appellate review by objecting at trial and filing a written posttrial motion addressing it. *M.S.*, 2018 IL App (1st) 172659, ¶ 26.

¶ 194      The reviewing court also rejected the respondent mother's request for review pursuant to the plain error doctrine. Ill. S. Ct. R. 366(b) (eff. Feb. 1, 1994). The court noted that, "[i]n civil cases, the plain error rule usually applies 'only where the act complained of was a prejudicial error so egregious that it deprived the complaining party of a fair trial and substantially impaired the integrity of the judicial process.' (Internal quotation marks omitted.)" *M.S.*, 2018 IL App (1st) 172659, ¶ 27 (quoting *In re Marriage of Saheb*, 377 Ill. App. 3d 615, 627 (2007)). Even if the trial court erred by holding an *ex parte* conversation with the minor, "for plain error to apply, the error must be prejudicial; that is, the case must be a close one." *M.S.*, 2018 IL App (1st) 172659, ¶ 27.

¶ 195      The record in this case does not support Alyssa's claim that the trial court's conversations with the minors played a significant role in its decision to terminate her parental rights.

¶ 196      In 2012, Alyssa was charged with and eventually pleaded guilty to child endangerment as to the minors and M.A. Those proceedings resulted in the minors' and M.A.'s placement in foster homes from April 2012 to August 2015. At the time of the 2017 best interests hearing, Alyssa was incarcerated awaiting trial on charges in connection with M.A.'s death. Alyssa points out that she is not contesting the finding that she is unfit. Nonetheless, Alyssa's own actions towards one of her children have again resulted in criminal charges being placed against her. The twins and, for the second time, the minors are in foster care. Alyssa's future is unknown, but her past actions with regard to her children are in evidence in this case.

¶ 197      Of the statutory factors the trial court is required to consider in ruling on the best interest of the minors, the child's wishes and long-term goals are but 1 of 10. See 705 ILCS 405/1-3(4.05) (West 2016). We have reviewed the interviews the trial court conducted with the minors as well as the trial court's comments before and after those interviews. Nothing indicates that the trial court's interviews with the minors were anything more than to confirm what other witnesses testified to regarding the minors' wishes for their future lives. See *M.S.*, 2018 IL App (1st) 172659, ¶ 28 (finding no prejudice where the *ex parte* conversation between the judge and the minor was merely cumulative to the other evidence properly admitted). Moreover, in contrast to *M.S.*, here the parties' attorneys, the guardian *ad litem*, and a court reporter were present for the interviews.

¶ 198    From our review of the record, we are satisfied that the information the trial court learned from its interviews with the minors was of limited significance in reaching its decision to terminate Alyssa's parental rights. Contrary to Alyssa's contention, this was not a close case, and in the absence of prejudice, the plain error rule does not apply. We conclude that Alyssa forfeited her claim of error with respect to the trial court's interviews with the minors.

¶ 199    In the alternative, Alyssa contends that her trial attorney's failure to object to the trial court's decision to interview the minors denied her effective assistance of counsel. The two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), applies to a claim of ineffective assistance of counsel raised in a juvenile proceeding. Under that test, both counsel's deficiencies in representation and prejudice to the party asserting the claim must be satisfied. *In re Charles W.*, 2014 IL App (1st) 131281, ¶ 32. The prejudice prong requires the party to show that but for the error there is a reasonable probability, not merely a possibility, that the result would have been different. *Charles W.*, 2014 IL App (1st) 131281, ¶ 32. The court need not consider the deficiency prong but may dispose of the claim where the party did not suffer any prejudice. *Charles W.*, 2014 IL App (1st) 131281, ¶ 33.

¶ 200    We determined that Alyssa was not prejudiced by any alleged error in connection with the trial court's interviews with the minors. Therefore, she cannot establish ineffective assistance of counsel for failing to object to the trial court's interviews with the minors.

¶ 201                              B. Prior Consistent Statements

¶ 202    Alyssa contends that the trial court erred when it allowed the statements by the minors concerning where they were to live to be bolstered by testimony from their foster parents and Ms. Hipp that the minors expressed the same placement preferences prior to their interviews with the court. She maintains that the admission of this testimony bolstered improperly the statements of the minors to the trial court on that same issue.

¶ 203                              1. *Standard of Review*

¶ 204    "The admissibility of evidence is within the sound discretion of the trial court." *In re C.H.*, 398 Ill. App. 3d 603, 607 (2010). The trial court's evidentiary determinations will not be reversed unless there is a clear abuse of that discretion. *C.H.*, 398 Ill. App. 3d at 607.

¶ 205                              2. *Discussion*

¶ 206    While Alyssa acknowledges that she failed to raise the error in the trial court, she contends that the admission of prior consistent statements is reviewable pursuant to the plain error doctrine (Ill. S. Ct. R. 366(b) (eff. Feb. 1, 1994)), relying on *People v. Smith*, 139 Ill. App. 3d 21 (1985). In that case, the reviewing court observed that "[t]he improper bolstering of a witness'[s] credibility has been deemed plain error because corroboration by repetition 'preys on the human failing of placing belief in that which is most often repeated.' " (Internal quotation marks omitted.) *Smith*, 139 Ill. App. 3d at 32 (quoting *People v. Hudson*, 86 Ill. App. 3d 335, 340 (1980)). There are exceptions to the admission of prior consistent statements, *i.e.*, responding to a charge of recent fabrication or the raising of an inference that the witness had a motive to testify falsely. *Smith*, 139 Ill. App. 3d at 32. In addition, Alyssa contends that the rule of forfeiture is relaxed where the conduct of the trial court is the source

of the error. See *People v. Sprinkle*, 27 Ill. 2d 398 (1963). Neither case supports Alyssa's contentions.

¶ 207 During the trial in *Sprinkle*, the trial judge made comments and questioned witnesses in a manner the supreme court described as having "no place in the conduct of a trial before a jury." *Sprinkle*, 27 Ill. 2d at 401. Even though no objections were made by defense counsel, in the interests of a fair trial for the defendant and the preservation of the judicial process, the court determined that the improper questions and comments may have prejudiced the defendant in the eyes of the jury and required that the defendant receive a new trial. *Sprinkle*, 27 Ill. 2d at 401-03.

¶ 208 Unlike the present case, *Sprinkle* was a jury trial where the conduct and comments of the trial court permeated the entire trial. In contrast, the trial court's determination of the best placement for the minors in this case could not be based solely on their preferences. Regardless of where the minors wanted to live, the trial court was required to consider the multiple factors set forth in section 1-3(4.05) of the Act. See 705 ILCS 405/1-3(4.05) (West 2016).

¶ 209 The reviewing court in *Smith* found the admission of a prior consistent statement in a jury trial was reversible error where the witness's in-court testimony was crucial or where there is competent evidence to establish a defendant's guilt beyond a reasonable doubt, but the improper admission of the statement "clouds the evidence to such a degree that it is impossible to tell whether the jury relied on it." *Smith*, 139 Ill. App. 3d at 34. In the present case, the minors' statements to the trial court were not crucial to the trial court's best interest determination. See *In re Curtis W.*, 2015 IL App (1st) 143860, ¶ 56 (no one statutory factor is determinative in determining the child's best interests). There is no indication that the trial court considered the minors' statements to it more credible because they stated them previously to other parties.

¶ 210 Clearly this was not an attempt to bolster the minors' credibility. First, the minors were not under oath when they spoke with the trial court. Second, in talking to the minors, the court was seeking insight, not testimony from them. The fact that their wishes as to where and with whom they would live remained the same was not a matter of credibility. In other words, their statements to the trial court were not to confirm that they had earlier expressed the same preference.

¶ 211 We find that Alyssa's failure to object to the testimony forfeited any error in the admission of the prior consistent statements. For purposes of plain error analysis, we find no error in the admission of the witnesses' testimony as to the placement preferences the minors voiced because the minors' credibility was not a factor in trial court's interviews with them. Moreover, even if error occurred, we reject Alyssa's characterization of the evidence as being closely balanced, which she argued as the basis for plain error review. The minors' statements were not crucial to the best interests determination, and the remaining factors overwhelmingly supported the trial court's best interests determination.

¶ 212 We also reject Alyssa's related claim that her trial attorney's failure to object to the admission of the prior consistent statements was ineffective assistance of counsel. No error occurred in the admission of the minors' statements to the trial court. Even if we were to assume that error occurred, there was no prejudice to Alyssa. Therefore, she cannot establish either prong of the *Strickland* test for ineffective assistance of counsel. See *Charles W.*, 2014

IL App (1st) 131281, ¶ 32.

¶ 213                                    C. Best Interests
¶ 214    Alyssa contends that the termination of her parental rights was not in the best interests of the minors. In support of her argument, Alyssa adopts Francisco's sufficiency of the evidence argument and refers this court to the arguments she raised in her first two issues as to the weighing of the best interest factors.

¶ 215    Francisco's sufficiency of the evidence argument does not aid Alyssa. Francisco argued that he was not the custodial parent and was not involved in the events leading up to M.A.'s death. In contrast, Alyssa was the custodial parent and was charged with offenses in connection with M.A.'s death. Moreover, while Francisco challenged the trial court's finding that he was unfit based on depravity, Alyssa stated that she was not challenging the trial court's finding that she was unfit. Alyssa's reliance on her due process and trial court error claims is of no assistance, as we have rejected both claims as well as her claims of prejudice.

¶ 216    The evidence in this case was more than sufficient to support the trial court's determination that it was in the best interests of the minors that Alyssa's parental rights be terminated.

¶ 217                                    III. Isaac's Appeal
¶ 218    Isaac contends that (1) the findings that the twins were abused and neglected was against the manifest weight of the evidence, (2) the finding that he was unfit was against the manifest weight of the evidence, (3) the trial court's best interests finding was against the manifest weight of the evidence, and (4) the expedited termination of his parental rights was improper.

¶ 219                                 A. Abuse and Neglect Findings
¶ 220                                  1. *Standard of Review*
¶ 221    We will not reverse a trial court's ruling on neglect or abuse unless it is against the manifest weight of the evidence. *In re Davon H.*, 2015 IL App (1st) 150926, ¶ 47. "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident." *In re Arthur H.*, 212 Ill. 2d 441, 464 (2004). "We may affirm the trial court's ruling if any of the trial court's bases of abuse or neglect may be upheld." *In re Kenneth D.*, 364 Ill. App. 3d 797, 802 (2006).

¶ 222    Under the manifest weight of the evidence standard, the reviewing court gives deference to the trial court as the finder of fact " 'because it is in the best position to observe the conduct and demeanor of the parties and the witnesses and has a degree of familiarity with the evidence that a reviewing court cannot possibly obtain.' " *In re A.W.*, 231 Ill. 2d 92, 102 (2008) (quoting *In re D.F.*, 201 Ill. 2d 476, 498-99 (2002)). " 'A reviewing court, therefore, must not substitute its judgment for that of the trial court regarding the credibility of witnesses, the weight to be given to the evidence, or the inferences to be drawn.' " *A.W.*, 231 Ill. 2d at 102 (quoting *D.F.*, 201 Ill. 2d at 499).

¶ 223                                      2. *Discussion*
¶ 224    Isaac contends that the evidence that the twins were neglected and abused was not clear and convincing. He maintains that since he was not the father of the minors or M.A., he owed

no duty to them. Isaac points out that the trial court's finding that the minors' statements in their interviews suggested that he acted as a parent was insufficient to establish that fact by clear and convincing evidence.

¶ 225 While the trial court used the clear and convincing evidence standard in making its finding that the twins were neglected and abused, the correct standard is preponderance of the evidence. *Davon H.*, 2015 IL App (1st) 150926, ¶ 47. It is the State's burden to prove the neglect and abuse allegations by a preponderance of the evidence, establishing the allegations of neglect or abuse are more probably true than not. *Davon H.*, 2015 IL App (1st) 150926, ¶ 47. The preponderance standard of proof "allocates the risk of error roughly equally between the litigants [citation], reflecting the view that the interests at stake are of relatively equal societal importance [citation]." *In re D.T.*, 212 Ill. 2d 347, 362 (2004).

¶ 226 The trial court found the twins to be neglected minors based on an injurious environment (705 ILCS 405/2-3(1)(b) (West 2016)) and abused because of the risk of injury from a parent (705 ILCS 405/2-3(2)(ii) (West 2016)). Since the twins have yet to live with him, Isaac asserts that they have not been exposed to an injurious environment and they are not in danger of being injured by him.

¶ 227 Cases involving abuse and neglect are *sui generis* and must be decided upon their unique facts. *Arthur H.*, 212 Ill. 2d at 463. Our courts have recognized that "[a]n 'injurious environment' is an amorphous concept which cannot be defined with particularity; therefore, each case should be reviewed considering the specific circumstances of that case." *In re M.K.*, 271 Ill. App. 3d 820, 826 (1995).

¶ 228 The trial court's findings that the twins were neglected and abused were premised on the theory of anticipatory neglect and abuse. "Under the anticipatory neglect theory, the State seeks to protect not only children who are the direct victims of neglect or abuse, but also those who have a probability to be subject to neglect or abuse because they reside, or in the future may reside, with an individual who has been found to have neglected or abused another child." *Arthur H.*, 212 Ill. 2d at 468. "Although the neglect of one child does not conclusively show the neglect of another child, the neglect of one minor is admissible as evidence of the neglect of another minor under a respondent's care." *In re Zion M.*, 2015 IL App (1st) 151119, ¶ 30. Under the theory of anticipatory neglect, where there is evidence of prior neglect by the parents, the trial court should not be deterred from acting until another child is injured. *Zion M.*, 2015 IL App (1st) 151119, ¶ 30. "[T]he term 'injurious environment' has been interpreted to include, 'the breach of a parent's duty to ensure a "safe and nurturing shelter" for his or her children.' " *Arthur H.*, 212 Ill. 2d at 463 (quoting *In re N.B.*, 191 Ill. 2d 338, 346 (2000), quoting *M.K.*, 271 Ill. App. 3d at 826).

¶ 229 In their victim interviews, the minors detailed the harsh conditions in which four-year-old M.A. was forced to live: deprived of clothing, forced to sleep in a storage area and, for lack of a bed, in a kitty litter box; stealing food from the refrigerator in order to eat because he was not fed regularly; begging food from neighbors; and enduring frequent physical punishments. E.V. told Ms. Perez that Alyssa and Isaac were in charge of feeding M.A. and that sometimes they did not feed him. G.V. told Ms. Perez that Isaac was "mean" to M.A. There is no dispute that Isaac took an active role in concealing M.A.'s death and disposing of his body.

¶ 230 There is little direct evidence that Isaac acted in the role of a parent in his interactions with the minors and M.A. However, we are satisfied that the facts and the reasonable

- 25 -

inferences therefrom were sufficient to establish by a preponderance of the evidence that Isaac assumed a parental role in the lives of the minors and M.A. and that his actions contributed to the creation of an injurious environment. Therefore, it was probable that the twins would be neglected and abused by Isaac.

¶ 231　　Isaac relies on cases holding that to be guilty of contributing to the delinquency of a minor or neglect of a minor the defendant must be the parent of or stand in *loco parentis* to the minor. However, Isaac was not charged with the criminal offenses of contributing to the delinquency of a minor or contributing to the neglect of a minor. See *People v. Warner*, 98 Ill. App. 3d 433 (1981) (the defendant, standing in *loco parentis* to the minors, was sentenced to one year's probation for contributing to their neglect).

¶ 232　　Here, the trial court found by a preponderance of the evidence that the twins would be abused and subjected to an injurious environment under the anticipatory neglect theory. Based on the record before us, we cannot say that the opposite conclusion is clearly evident. We conclude that the trial court's findings of anticipatory neglect and abuse as to the twins were not against the manifest weight of the evidence.[5]

¶ 233　　　　　　　　　　　　　　B. Unfitness

¶ 234　　Isaac contends that the State failed to establish by clear and convincing evidence that he was unfit.

¶ 235　　　　　　　　　　　　　1. *Standard of Review*

¶ 236　　A trial court's finding that there was clear and convincing evidence of parental unfitness will not be reversed unless it is against the manifest weight of the evidence. *In re C.N.*, 196 Ill. 2d 181, 208 (2001). "A finding is against the manifest weight of the evidence where the opposite conclusion is clearly evident." *C.N.*, 196 Ill. 2d at 208.

¶ 237　　　　　　　　　　　　　　2. *Discussion*

¶ 238　　When the trial court makes an expedited termination ruling, "the evidence supporting a finding of unfitness is necessarily that evidence presented at the adjudicatory hearing." *Tyianna J.*, 2017 IL App (1st) 162306, ¶ 82; 705 ILCS 405/2-21(5)(iii) (West 2016). The trial court considers the same evidence under two different standards; it must decide whether a preponderance of the evidence supports a finding of abuse, neglect, or dependency, and then following a dispositional finding, it reviews the same evidence to determine if the parent's unfitness is established by clear and convincing evidence. *Tyianna J.*, 2017 IL App (1st) 162306, ¶ 82. The trial court found by clear and convincing evidence that Isaac was unfit based on his substantial neglect, either continuous or repeated, of a child residing in the household, which resulted in the death of the child (750 ILCS 50/1(D)(d-1) (West 2016)), and that he behaved in a depraved manner (750 ILCS 50/1(D)(i) (West 2016)).

---

[5]Isaac also claims that the trial court erred when it failed to appoint a guardian for him as he was a minor at the time of his arrest. He failed to cite that portion of the record where he raised this claim of error before the trial court. Therefore, the claim of error is forfeited. *M.S.*, 2018 IL App (1st) 172659, ¶ 26.

¶ 239    Isaac argues that the State failed to prove that he owed any duty to the minors and M.A. and, therefore, he bore no responsibility for any neglect that resulted in M.A.'s death. Even if we were to determine that, while the evidence of neglect and abuse was established under the preponderance of the evidence standard, the same evidence did not reach the clear and convincing standard, an unfitness finding may be entered if there is sufficient evidence to satisfy any one ground. *In re Brandon A.*, 395 Ill. App. 3d 224, 238 (2009).

¶ 240    Isaac argues that the evidence that he behaved in a depraved manner was not clear and convincing. He points out none of his juvenile offenses may be used to establish the presumption of depravity. 750 ILCS 50/1(D)(i) (West 2016). Isaac emphasizes that he was a minor at the time of the events leading up to and including M.A.'s death and, therefore, his actions should be considered in the context of his youth and his potential for rehabilitation. Finally, Isaac points out that, in his letter to the trial court, he expressed remorse for his actions.

¶ 241    Our courts have held that depravity may be shown where a parent engages in a course of conduct indicating a moral deficiency and an inability to conform to accepted morality. *Shanna W.*, 343 Ill. App. 3d at 1166. "The statutory ground of depravity requires the trier of fact to closely scrutinize the character and credibility of the parent and the reviewing court will give such a determination deferential treatment." *J.A.*, 316 Ill. App. 3d at 563.

¶ 242    The trial court heard the evidence of Isaac's involvement in the neglect and abuse of M.A. resulting in the child's death, as well as his participation in its gruesome aftermath. It is noteworthy that three days after his twin sons were born, Isaac attempted to cover up four-year-old M.A.'s death by burning his remains. On the basis of that evidence, the court found that Isaac behaved in a depraved manner. Isaac's letter expressing remorse and accepting responsibility for his actions by admitting the allegations in the delinquency petition, if sincere, indicates that in the *future* his conduct may conform to accepted morality. However, the trial court's finding that Isaac behaved in a depraved manner is amply supported by the evidence.

¶ 243    We conclude that the trial court's finding that Isaac was guilty of substantial neglect of M.A. resulting in his death and that he behaved in a depraved manner was supported by clear and convincing evidence. Therefore, the trial court's ruling that Isaac was unfit was not against the manifest weight of the evidence.

¶ 244                                        C. Best Interests

¶ 245    Isaac contends that it was not in the best interests of the twins for his parental rights to be terminated and that they be made wards of the court.

¶ 246                                    1. *Standard of Review*

¶ 247    The manifest weight of the evidence standard applies to our review of a trial court's best interests determination. *Curtis W.*, 2015 IL App (1st) 143860, ¶ 49.

¶ 248                                        2. *Discussion*

¶ 249    It is the State's burden to prove by a preponderance of the evidence that termination of parental rights is in the child's best interest. *Curtis W.*, 2015 IL App (1st) 143860, ¶ 53. Once a finding of unfitness is made, the trial court focuses on the needs of the child in determining

whether the parental rights should be terminated. *Curtis W.*, 2015 IL App (1st) 143860, ¶ 52. In determining the best interests of a child, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life. *Curtis W.*, 2015 IL App (1st) 143860, ¶ 52. "A child's best interest is superior to all other factors, including the interests of the biological parents." *Curtis W.*, 2015 IL App (1st) 143860, ¶ 52.

¶ 250    Isaac argues that denying him visitation with the twins and failing to provide him with services prevented the Act's stated goal of reunification of parents with their children from being achieved. He points out that the twins had been in the care of Linda and Steve for only six months at the time of the best-interests hearing, Linda had no contact information regarding the twins' biological family, and they were not equipped to assist the twins' bilingual language development. Isaac asserts that the twins deserve to have a chance to have a relationship with him and that, if he is afforded services and visitation with the twins, the Act's goal of "reunification" will occur.

¶ 251    The intent of the Act includes "reunifying families where the minor can be cared for at home without endangering the minor's health or safety and it is in the best interests of the minor, and, *if reunification is not consistent with the health, safety and best interests of the minor, finding another permanent home for the minor*." (Emphasis added.) 705 ILCS 405/2-14(a) (West 2016). Nonetheless, the evidence established that the health and safety of the twins would be at risk with Isaac. Due to Isaac's alleged involvement in circumstances surrounding the death of M.A., the August 23, 2016, integrated assessment did not recommend services toward Isaac's "reunification" with the twins. The assessment did recommend that Isaac be assessed for services directed toward assisting him with his own problems. Even assuming Isaac is sincere in his desire to change, there is no way of knowing when or if he would ever be in a position to accept parental responsibilities for the twins.

¶ 252    The needs of the twins, not the wishes of Isaac, are the proper focus of the best interests determination. To postpone providing the twins with a permanent home with adoptive parents who will love and care for them and continue the stability they have enjoyed in their brief lives would not be in the best interests of the twins and contrary to the language of section 2-14(a) of the Act.

¶ 253    We conclude that the trial court's determination that the best interests of the twins required the termination of Isaac's parental rights was not against the manifest weight of the evidence.

¶ 254                    D. Expedited Termination of Parental Rights

¶ 255    Isaac contends that the expedited termination of his parental rights was improper because none of the factors set forth in section 1-2(1) of the Act applied to him. We previously addressed this issue in Francisco's appeal. Like Francisco, Isaac was not subject to the requirements of section 1-2(1) of the Act. 705 ILCS 405/ 1-2(1) (West 2016); see *Tyianna J.*, 2017 IL App (1st) 162306, ¶ 70 (section 1-2(1) of the Act does not control when expedited termination may take place). We look to whether, at the time of the termination of parental rights, all the conditions set forth in section 2-21(5) have been met and the parent was given a meaningful opportunity to be heard as to those conditions. *Tyianna J.*, 2017 IL App (1st) 162306, ¶ 71; 705 ILCS 405/2-23(7) (West 2016).

¶ 256    Isaac focuses on the requirement that the trial court must find that reasonable efforts were inappropriate or were made and were unsuccessful. 705 ILCS 405/2-21(5)(iv)(A-5) (West

2016). Isaac disputes that finding, placing special emphasis on the fact that he was never assessed for services geared toward reunification with the twins because DCFS predetermined that reasonable efforts were inappropriate, despite the absence of a poor prognosis for his rehabilitation. He points out that he had been compliant with the services he received as part of the juvenile justice mental health treatment plan and that he was displaying an increased understanding of parental skills. He notes that, in his letter to the trial court, he expressed remorse for his prior acts and a willingness to do whatever was necessary to be a parent for the twins.

¶ 257    While his juvenile case was pending, Isaac refused to participate in DCFS's 2016 integrated assessment on the advice of his attorney. Nonetheless, according to Ms. Hipp, Isaac would have been assessed for services if he was not found unfit.

¶ 258    Isaac's expression of remorse in his letter to the trial court and his expressed willingness to engage in any service that would allow him to parent the twins are commendable. Nonetheless, in light of the evidence of his participation in the horrific abuse that led to the death of a four-year-old child and his participation in the horrific efforts to dispose of the child's body, there was no compelling evidence that, even with services, Isaac could make the necessary changes to the degree that the twins could ever be placed in his care. Other than fathering the twins, Isaac had no contact with them. After their birth, Isaac participated in the cover-up of M.A.'s death and the disposal of his body, seemingly unconcerned with assuming his responsibilities as the twins' parent. The twins were left at the hospital until they were placed with the Irvings. As previously noted, the best interests of the twins require placement in a loving and stable home as soon as possible and cannot wait until Isaac develops his parenting skills.

¶ 259    Upon review of the record, we determine that the conditions set forth in section 29-5 of the Act for the termination of Isaac's parental rights were met. Therefore, the trial court's expedited termination of Isaac's parental rights was proper.

¶ 260                                                    CONCLUSION

¶ 261    We conclude that the trial court's adjudication, unfitness, and best interests determinations as to the minors and the twins were not against the manifest weight of the evidence. We further conclude that the trial court's expedited termination of Francisco's and Isaac's parental rights was proper in this case. We reject Alyssa's claims that she was denied due process, that she was denied the effective assistance of counsel, and that the trial court erred in admitting prior consistent statements.

¶ 262    The judgment of the circuit court is affirmed.

¶ 263    Affirmed.